04-21431

Sealed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

CIV-JORDAN

**FILED UNDER SEAL AND IN CAMERA
PURSUANT TO 31 U.S.C. § 3730(b)(2)**



EVE BARYS and DWAYNE OSTROM,
on behalf of the United States of America
and the State of Florida,

      Plaintiffs,

vs.

VITAS HEALTHCARE CORPORATION,
VITAS HOSPICE SERVICES, LLC
VITAS HEALTHCARE CORPORATION OF
FLORIDA, ET AL

      Defendants.
_____/

**QUI TAM COMPLAINT
AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.  Relators, EVE BARYS (hereinafter "Barys") and DWAYNE OSTROM (hereinafter "Ostrom") bring this action on behalf of the United States of America and the State of Florida against Defendants, VITAS HEALTHCARE CORPORATION, VITAS HOSPICE SERVICES, LLC, VITAS HEALTHCARE CORPORATION OF FLORIDA, and all other corporations or other legal entities in the United States of America which are owned, in whole or in part, or operated by VITAS Healthcare Corporation (hereinafter, "VITAS"), for treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. 3729, *et seq.,* and the State of Florida False Claims Act, 68.081 – 68.092, Florida Statutes.  The violations arise out of Defendants' false claims based on

requests for payment by Medicare, Medicaid and other government agencies and programs (hereinafter "Government" or "Plaintiffs") based on false records and statements.

2.   The Relators have complied with the False Claims Act in that they have served a copy of the Qui Tam Complaint and written disclosure of substantially all material evidence and information the Relators possess upon the United States Attorney General and the United States Attorney for the Southern District of Florida. 31 U.S.C.A. § 3730(a)(2).

3.   The Relators have complied with the Florida False Claims Act in that they have served a copy of the Qui Tam Complaint and written disclosure of substantially all material evidence and information the Relators possess upon the Attorney General of the State of Florida, as head of the department, and on the Chief Financial Officer, as head of the Florida Department of Financial Services. Fla. Stat. § 68.083(3).

## PRELIMINARY STATEMENT OF VITAS' FRAUDULENT CONDUCT

4.   VITAS is the largest provider of hospice services in the United States.  In the first quarter of 2004, VITAS' average daily census ("ADC") was 8,097.

5.   The majority of the patients who receive hospice services from VITAS are covered by federal healthcare programs such as Medicare and Medicaid, which are the payors for the services rendered by the Defendants to those patients.

6.   VITAS has knowingly, deliberately, and systematically overcharged federal health care programs for hospice services rendered to patients who were ineligible for the hospice benefits provided by those programs.

7.   The pervasive fraud and false claims described herein occurred at VITAS' programs in Miami-Dade, Florida and Broward County, Florida and other VITAS programs elsewhere in Florida, California, Illinois, New Jersey, Ohio Pennsylvania and Wisconsin.

**FILED UNDER SEAL**

8.  This Complaint is filed *in camera* pursuant to 31 U.S.C. § 3730(b)(2) and will not be served on the Defendants until the Court so orders.

**JURISDICTION AND VENUE**

9.  This court has subject matter jurisdiction for this Federal False Claims Act claim brought on behalf of the United States Government pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

10. This court has subject matter jurisdiction for this Florida False Claims Act claim brought on behalf of the State of Florida pursuant to 28 U.S.C. § 3732(b).

11. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c).

**PARTIES**

12. The Relators are suing in the name of and on behalf of Plaintiff, UNITED STATES, pursuant to the provisions of 31 U.S.C. § 3730(b)(1).

13. The Relators are suing in the name of and on behalf of the Plaintiff, STATE OF FLORIDA, pursuant to the provisions of Fla. Stat. § 68.083(2).

14. Relator, EVE BARYS ("Barys"), is a citizen of the United States and a resident of the State of Florida.

15. Barys brings this action based upon her direct knowledge gained while employed by VITAS as Director of Admissions and also on information and belief.

16. Relator, DWAYNE OSTROM ("Ostrom"), is a citizen of the United States and a resident of the State of Florida.

17. Ostrom brings this action based upon his direct knowledge gained while employed by VITAS as Vice President – Hospice Operations Support and also on information and belief.

18. On information and belief, the Relators are the original source of the information.

19. Defendant, VITAS HEALTHCARE CORPORATION, is a Delaware corporation with its principal place of business in Miami, Florida and is authorized to do business in Florida. Its registered agent for service of process in Florida is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

20. Defendant, VITAS HOSPICE SERVICES, LLC, is a Delaware limited liability company with its principal place of business in Miami, Florida and is authorized to do business in Florida.  Its registered agent for service of process in Florida is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

21. Defendant, VITAS HEALTHCARE CORPORATION OF FLORIDA, is a Florida corporation with its principal place of business in Miami Florida.  Its registered agent for service of process in Florida is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

22. At all times material hereto, Defendant, VITAS, and its subsidiaries and affiliates, acted through its employees, agents, and independent contractors.

23. At all times material hereto, the acts of Defendants' employees, agents and independent contractors were within the scope of their agency and employment.

## BACKGROUND

### A.  HOSPICE CARE

24.  Hospice care is an approach to caring for terminally ill individuals.  Hospice services are intended to provide comfort and pain relief, as opposed to curative care, which seeks to reverse the underlying disease or condition.

25. Hospice services may be provided in a patient's home, a hospital, a nursing home or private hospice facility.

### B. THE MEDICARE PROGRAM

26. In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare") to pay for the cost of certain medical services for persons aged 65 and older, certain persons with disabilities and persons with kidney failure.

27. The U.S. Department of Health and Human Services ("HHS") administers the Supplementary Medical Insurance Program for the Aged and Disabled ("Medicare") through the Centers for Medicare & Medicaid Services ("CMS"), a division of HHS formerly known as the Health Care Financing Administration ("HCFA").

28. The Medicare program has two parts:   Medicare Part A ("Hospital Insurance Program") provides for care in or by institutional providers, such as hospices, within specified limits.  *See* 42 U.S.C. § 1395c, *et seq.*  Medicare Part B ("Supplemental Medical Insurance Program") pays for physician services and a variety of outpatient services.  *See* 42 U.S.C. § 1395 j, *et seq.*

29. In order to participate in the Medicare program, a health care provider must enter into an agreement ("Provider Agreement") with the Secretary of HHS.  §1395cc.  After entering into

a Provider Agreement, Medicare directly reimburses the provider for the reasonable cost of services provided to Medicare patients.

30. Under Medicare regulations, the term "provider" means a hospital, a critical access hospital, a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency, or a hospice that has in effect an agreement to participate in Medicare, or a clinic, a rehabilitation agency, or a public health agency that has in effect a similar agreement but only to furnish outpatient physical therapy or speech pathology services, or a community mental health center that has in effect a similar agreement but only to furnish partial hospitalization services. 42 CFR § 400.202.

31. A provider must comply with the requirements of the Medicare and Medicaid programs in order to be eligible to receive payments from these programs for hospice services.

32. Since their enactment and implementation, the Medicare and Medicaid programs have enabled the elderly, disabled and low-income patients to obtain necessary medical services. One factor that is critical to the viability and solvency of these programs is that providers bill the payors only for those services that are provided to individuals who are duly eligible for benefits pursuant to program rules and regulations.

33. The Medicare and Medicaid programs are based on trust and are vulnerable to fraud and abuse by unscrupulous providers.

34. "The most frequent kind of [Medicare] fraud arises from a false statement or misrepresentation made, or caused to be made, that is material to entitlement or payment under the Medicare program," such as the "[i]ncorrect reporting of diagnoses or procedures to maximize payments." Medicare Program Integrity Manual, Ch. 1, § 3.1 – Examples of Medicare Fraud – (Rev. 3, 11-22-00).

35. In May 1995, the Secretary of HHS announced "Operation Restore Trust" ("ORT"), a joint project of the Office of the Inspector General ("OIG"), HCFA and the Administration on Aging.

36. ORT sought, *inter alia,* the identification of vulnerabilities in the Medicare Program and reduction of Medicare's exposure to fraud, waste and abuse.

## C.  THE MEDICAID PROGRAM

37. Medicaid was enacted in 1965 to pay for the cost of certain medical services for low-income patients.

38. CMS also works in partnership with the states to administer Medicaid.

39. The United States and state governments that choose to participate in the program share Medicaid funding.  The Medicaid program mirrors Medicare in every state.

40. The Agency for Health Care Administration of Florida ("AHCAF") administers Florida's Medicaid program.

## D. MEDICARE HOSPICE BENEFIT

41. The Medicare Hospice Benefit ("MHB") was passed as part of the Tax Equity and Fiscal Responsibility Act ("TEFRA") of 1982.

42. Under Medicare regulations, in order to be eligible for the MHB an individual must be entitled to Part A of Medicare and a doctor must certify that the patient has a terminal disease and less than 6 months to live if the disease runs its normal course. 42 C.F.R. § 418.20.

43. An individual who meets the eligibility requirement for the MHB must file an election statement setting forth, *inter alia*: 1) the particular hospice that will provide care to the individual; 2) acknowledgement that the individual or individual's representative has been given

a full explanation of the nature of hospice care as opposed to curative care; 3) acknowledgement that certain Medicare services are waived by the election of the MHB.  42 C.F.R. § 418.24(b).

44. For the duration of an election of hospice care, MHB beneficiaries waive all rights to Medicare payments for "hospice care provided other than by a hospice designated by the individual (unless provided under arrangements made by the designated hospice)"; "[a]ny Medicare services that are related to the treatment of the terminal condition for which hospice care was elected or a related condition or that are equivalent to hospice care…" except under certain circumstances. 42 C.F.R. § 418.24(d).

45. Once a beneficiary elects the MHB, the hospice is paid a predetermined fee for each day the patient receives care, regardless of the amount of care that the hospice provides.

46. Medicare regulations require that a hospice must designate an interdisciplinary group ("ID Group") or groups comprised of hospice employees that include at least the following: 1) a doctor of medicine or osteopathy; 2) a registered nurse; 3) a social worker; and 4) a pastoral or other counselor. 42 C.F.R. § 418.68(a).

47. The ID Group is responsible for participation in the establishment of the plan of care, provision or supervision of hospice care and services, periodic review and updating of the plan of care for each individual receiving hospice care, and establishment of policies governing the day-to-day provision of hospice care and services.  42 C.F.R. § 418.68(b).

48. Medicare regulations require that a hospice maintain a clinical record for each patient. 42 C.F.R. § 418.74.

49. Each patient's clinical record must contain 1) the initial and subsequent assessments; 2) the plan of care; 3) identification data; 4) consent and authorization and election forms; 5)

pertinent medical history; and 6) complete documentation of all services and events (including evaluations, treatments, progress notes, etc.).  42 C.F.R. § 418.74(a).

50. A patient's clinical record must be sufficient to support MHB claims in that it must contain documentation to support the patient's prognosis.

51. Medicare regulations define Terminally Ill as "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course**."** 42 C.F.R. § 418.3.

52. The MHB is divided into the following benefit periods:  1) the initial 90-day period; 2) subsequent 90-day period; and 3) unlimited number of 60-day benefit periods.  42 U.S.C. § 1395d(a)(4).

53. In the initial 90-day benefit period, the individual's attending physician and the medical director or physician member of the interdisciplinary group of the hospice program providing or arranging for the care must each certify in writing at the beginning of the period that the patient is Terminally Ill.  42 U.S.C. § 1395f(a)(7).

54. After the initial certification, a physician must re-certify that the patient is Terminally Ill at the beginning of each benefit period following a second 90-day period and every 60 days thereafter. 42 U.S.C. § 1395f(a)(7).

55. The certification or re-certification "must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course." 42 C.F.R. § 418.22.

56. The certification and re-certification of a patient's eligibility for the MHB must be based on the physician's clinical judgment regarding the normal course of the individual's illness

with respect to whether the individual patient's prognosis is 6 months or less if disease state runs its normal course.  42 U.S.C. § 1395f(a)(7).

57. While a beneficiary may potentially be eligible for an unlimited number of benefit periods, a physician must properly and conscientiously re-certify the six-month prognosis using clinical judgment for a beneficiary to continue to receive the MHB.

58. Under the Medicare program, the certification and re-certification by a physician of a beneficiary's eligibility for the MHB at the beginning of each benefit period is material to entitlement and payment of the MHB by Medicare.  42 U.S.C. § 1395f(a)(7).

59. In Sept. 2000, the United States General Accounting Office ("GAO") published a Report to Congressional Requesters, entitled "MEDICARE:  More Beneficiaries Use Hospice but for Fewer Days of Care" ("GAO Report").  This Report sets forth the results of the GAO's analysis of HCFA claims and enrollment provider data for the period from November 1999 through August 2000.  GAO Report, p. 3-4.

60. According to the GAO Report,  "[t]he average period of hospice use declined from 74 days in 1992 to 59 days in 1998."

61. Not all patients who are appropriate for hospice are eligible for the MHB.

62. In cases where patients are not eligible for the MHB, alternative modes of reimbursement for hospice services can be sought, often through community support.

**E.  MHB FRAUD AND ABUSE**

63. In 1995, the OIG and HHS issued a Medicare Advisory Bulletin on Hospice Benefits, entitled, "Questionable Practices Affecting the Hospice Benefit October 1995," "to inform consumers and health care professionals about certain questionable practices affecting Medicare's hospice program" and to call "specific attention to the possible misuse of the hospice

benefit," as uncovered by ORT. 60 Fed. Reg. 55,721 (1995). A copy of the Federal Register notice setting forth the Bulletin is attached hereto as Exhibit "A".

64. According to the Bulletin, among the problems identified through ORT were that providers, "in efforts to maximize their Medicare reimbursement," may knowingly make incorrect determinations of prognosis for the purposes of meeting eligibility requirements for the MHB. 60 Fed. Reg. 55,721.

65. The Bulletin states that *"[t]he hospice benefit is restricted to patients with a diagnosis of terminal illness and prognosis of 6 months or less to live."* . 60 Fed. Reg. 55,721 (emphasis in original).

66. The Bulletin further states, in pertinent part:

> There have also been cases where physician certifications of terminal illness have been medically questionable. If a hospice submits claims to Medicare under circumstances where it knows of the absence of a terminal condition, the hospice may be liable for the submission of false claims.

60 Fed. Reg. 55,721-55,722.

67. The Bulletin puts hospice providers, including VITAS, on notice that they will be liable for the submission of false claims if they submit medically questionable certifications of patients' eligibility for the MHB.

### F. VITAS HEALTHCARE CORPORATION

68. Hospice Care, Inc., which changed its name to VITAS in 1992, began operations in South Florida as a non-profit corporation in 1978.

69. In the early 1980s, VITAS participated in the National Hospice Education Program, a grass-roots campaign to promote Medicare coverage of hospice care.

70. Soon after Congress passed the MHB, Hospice Care, Inc. changed to a for-profit corporation.

71. In December, 2003, VITAS Healthcare Corporation entered into a merger agreement with Rotor-Rooter, Inc., a publicly-traded corporation, with VITAS surviving the merger as an indirect wholly-owned subsidiary of Rotor-Rooter, Inc.

72. Rotor-Rooter, Inc. changed its name to Chemed Corp.; its new symbol on the New York Stock Exchange is CHE.

73. "VITAS classifies its services based on the location and type of care delivery." into three categories:  1) Home Care, which is "routine care provided to patients and their families residing at home or in a nursing facility." 2) Inpatient Care, which is "short-term care provided in a participating hospice unit, hospital or nursing facility that meets hospice standards." 3) Continuous Care, which is "care provided to patients at home, during periods of crisis when intensive monitoring and care, primarily nursing care, is required to achieve palliation or management of acute medical symptoms." Rotor-Rooter, Inc., Form 8K (2/24/2004).

74. In 2003, VITAS average daily reimbursement rates for Home Care, Inpatient Care and Continuous Care were $122.70, $544.98 and $541.88, respectively.  Rotor-Rooter, Inc., Form 8K (2/24/2004).

75. In the fiscal year 2003, 68.8% of VITAS revenues were from Home Care, 16.9% from Continuous Care and 14.3% from Inpatient Care.  Rotor-Rooter, Inc., Form 8K (2/24/2004).

76. Currently, "VITAS is the largest provider of hospice services in the United States in terms of both average daily census and net revenue from patient services." Rotor-Rooter, Inc., Form 8K (2/24/2004).

77. "In the five years ended September 30, 2003, VITAS increased its patient census by 51% primarily as a result of growth of existing programs." Rotor-Rooter, Inc., Form 8K (2/24/2004).

78. "In 2003, VITAS' net patient revenue was $420.1 million, which represents a 17% increase over fiscal 2002 net patient revenue of $359.2 million and a 31.5% increase over fiscal 2001 net patient revenue of $319.5 million." Rotor-Rooter, Inc., Form 8K (2/24/2004).

79. VITAS' largest programs are in Miami-Dade County, Florida and Broward County, Florida.

80. At all times material hereto, VITAS and its related entities were participating Medicare and Medicaid providers.

81. Defendant, VITAS, and its related entities, submit claims to Medicaid and Medicare for providing hospice services to patients.

**G. VITAS IS HIGHLY DEPENDENT ON PAYMENTS FROM MEDICARE AND MEDICAID**

82. 95.2%, 95.4% and 95.4% of VITAS' net patient services revenue for the years ended September 30, 2001, 2002 and 2003, respectively consisted of payments from the Medicare and Medicaid programs.  Rotor-Rooter, Inc., Form 8K (2/24/2004).

83. Medicare and Medicaid payments are made on a "per diem" basis, subject to an annual expenditure cap. Rotor-Rooter, Inc., Form 8K (2/24/2004).

**H. VITAS VIOLATED THE FALSE CLAIMS ACT BY IMPROPERLY CERTIFYING PATIENT ELIGIBILITY FOR THE MHB TO GET ITS FALSE CLAIMS PAID BY THE GOVERNMENT**

84. At all times material hereto, VITAS, as the largest provider of hospice services, is and has been aware of the requirement that the Medicare program only pays for hospice care

administered to beneficiaries who have been properly certified or re-certified as eligible for the MHB.

85. VITAS submitted claims to the United States for payment for services rendered to patients based on the false re-certification of patients as eligible for the MHB.

86. VITAS policies and practices were designed to keep patients in the program, increase patient census, and increase net patient revenues in flagrant violation of Medicare regulations.

87. VITAS implemented a system to promote the re-certification of patients for the MHB absent a physician's proper and conscientious clinical judgment concerning patients' prognosis as is required by the Medicare program.

88. VITAS policies for re-certification of patients for the MHB do not adhere to Medicare regulations in that VITAS continuously and systematically fails to obtain necessary information for the proper clinical determination of the individual prognosis of the patients under its care for each benefit period.

89. Through its policies and procedures, VITAS promotes team members' willful blindness to material information that is necessary in order to determine whether a patient remains eligible for the MHB.

90. VITAS' document, "Team Manager Compass Guide," is a training guide for team managers ("Compass").  A copy of the pertinent pages of the Compass is attached hereto as composite Exhibit "B".

91. The Team Manager is responsible for supervising the re-certification process and the Team Physician.

92. However, the Compass points in the wrong direction, as it encourages VITAS employees to re-certify patients for the MHB absent pertinent clinical information that would be

required in order for a physician to properly and conscientiously re-certify a patient's eligibility for the MHB.

93. VITAS typically re-certifies patients for the MHB absent any current lab work, diagnostic techniques or physician contact.

94. A physician cannot make a clinical judgment concerning a patient's prognosis where the necessary clinical data is not currently available.

95. Approximately two weeks prior to the end of a patient's MHB benefit period, a Team Meeting is held that is attended by at least the VITAS physician, registered nurse, chaplain, and social worker to determine whether the patient should be re-certified for the MHB.

96. The Compass states that "[i]f all the members of the team, including the VITAS physician, believe that the patient should be recertified, then the VITAS physician will complete the physician certification note." See Exhibit "B". ¶ 3.

97. The second page of VITAS' Physician Recertification Note contains the following certification :

> Based upon the above, it is my clinical judgement (sic.) that the patient, [patient's name], remains terminally ill with a prognosis of six months or less if the illness runs its normal course, and; therefore, is recertified for the benefit period beginning [date].

A copy of VITAS' form, "Physician Recertification Note, Form 141402 (Rev. 01/01) ("Physician Recertification Note"), is attached hereto as Exhibit "C".

98. The Physician Recertification Note also contains a section whereby, if the patient's prognosis is uncertain, the certifying physician notes that "[b]ased upon the above, the patient's prognosis is uncertain, and consultation will be obtained with the Medical Director." The

following section of the form contains a space for the physician to note the results of the consultation with the Medical Director.  <u>See</u> Exhibit "C", p. 2.

99. The Compass includes factors to consider during the re-certification process.  One of these factors is as follows:

> • Recognize that patients who have good symptom control may feel better and seem to improve.  If the underlying terminal illness still exists, however, the prognosis should be the same, and the patient should be recertified.

100.   Under Medicare rules, the re-certification of a patient should be based on a physician's clinical judgment of the patient's prognosis.  The continued existence of the terminal illness that initially made the patient eligible for the MHB, in the absence of other current clinical information concerning prognosis, is insufficient to warrant re-certification for the MHB.

101.   VITAS also instructs its employees as follows:

> • Patient and family wishes need to be considered.  If the patient's terminal illness may not appear to be progressing due to good symptom management, and the patient and family still desire a palliative approach to care, then the patient should be recertified.

102.   Here, VITAS is instructing its employees to deviate from Medicare regulations by taking the patient and family's desires into account when re-certifying a patient for the MHB under circumstances that may indicate that the patient's prognosis has improved.

103.   In the event that the panel at the Team Meeting determines that laboratory testing should be performed in order to re-certify a patient for the MHB, the two-week period between the team meeting and the beginning of the next benefit period is often insufficient to allow for testing of the patient prior to the start of the next benefit period.

104.   At the Team Meetings, VITAS re-certifies patients for the MHB without a physician properly and conscientiously re-certifying the six-month prognosis.

105.    VITAS typically re-certifies patients for the MHB without a physician visit or new clinical data, relying instead on notes of R.N. visits and the results from the original, pre-admission diagnostic tests that were initially used to certify the patient for the MHB.

106.    A VITAS patient receiving home care periodically receives visit by a Registered Nurse.

107.    A physician does not visit most VITAS patients during the re-certification process.

108.    Under VITAS' policy for the re-certification of a patient's prognosis, a physician is required to take the active steps necessary to make a clinical determination of a patient's prognosis, such as diagnostic studies, a physician visit and/or a conversation with the attending physician, only if the patient's prognosis is questioned by a team member at the Team Meeting, which may be an employee with no clinical training such as a home health aide, social worker or chaplain.  Exhibit "B", ¶ 4.

109.    If a patient is determined to be inappropriate for continued hospice care at a Team Meeting, VITAS' policy is to initiate another layer of administration.  Before discharge from the program is allowed, and in an effort to keep the patient at VITAS, the patients selected for discharge from hospice at the Team Meeting are presented at an additional meeting ("Discharge Meeting") to discuss their extended prognosis.

110.    At the Discharge Meeting, the Team Manager presents patient(s) to the panel, usually the program Medical Director, Patient Care Administrator and Director of Admissions or General Manager, and the group decides whether the patient should remain in hospice or be discharged as recommended by the team.

111.   A discharge for "extended prognosis" means a discharge where the patient's individual prognosis extends beyond six months, rendering the patient ineligible for the MHB.

112.   Under VITAS policies and procedures, if a Discharge Meeting does not take place, then there is no opportunity for patients to be discharged for extended prognosis.

113.   Upon information and belief, Team Managers were pressured not to recommend patients for Discharge Meetings.

114.   The VITAS program in Miami-Dade County, Florida stopped holding Discharge Meetings.

**I.   VITAS CREATED AN ECONOMIC INCENTIVE, THE "STRETCH GOAL," TO PROMOTE THE FALSE RE-CERTIFICATION OF PATIENTS AS ELIGIBLE FOR THE MHB**

115.   In an effort to increase its patient census and Medicare revenue, from October 2002 to the present, VITAS implemented an incentive program, called the "Stretch Goal," to encourage census growth and further promote its policy of willful blindness to clinical information that would be required for a physician to properly certify whether MHB beneficiaries under VITAS' care remained eligible for the MHB at the beginning of each benefit period.

116.   VITAS profits from its willful blindness to its patients' clinical information in that it enables it to keep receiving payments from Medicare for hospice care given to patients who are ineligible for the MHB.

117.   VITAS also profits in that it is does not incur the expenses for the diagnostic testing necessary for a physician's exercise of clinical judgment in re-certifying patients for the MHB.

118.   The ADC represents the average number of eligible patients admitted to a program.  The ADC is calculated by dividing the total number of days patients stayed in the program during a certain period by the total number of calendar days in that period.

119.   VITAS' Stretch Goal promotion offered certain employees bonuses ranging from $5,000 to $10,000 conditioned upon each program reaching its Stretch Goal Number, a program-specific ADC figure over and above normal growth expectations, by October 2003.

120.   Upon reaching the Stretch Goal number for each program, the General Manager was rewarded with a bonus of $10,000, and the Director of Admissions, Patient Care Administrator and Medical Director would each receive $5,000.

121.   The Stretch Goal for VITAS' Dade and Broward programs for the period from October, 2002 to October, 2003 was for each program to add 100 patients to its ADC.

122.   Seven of VITAS' twenty programs reached the Stretch Goal, including Dade, Broward, Chicago, Northwest, San Diego, Cincinnati, and San Fernando Inland.

123.   Once these programs reached the initial Stretch Goal, VITAS modified the promotion.  Under the modified Stretch Goal, General Managers would then receive a $5,000 bonus each time the ADC grew by 25, and Directors of Admission, Patient Care Administrators and Medical Directors would receive $2,500 each time the ADC grew by 15.

124.   Upon information and belief, VITAS continues its Stretch Goal promotion in order to promote longer patient lengths of stay ("LOS") regardless of whether the patients continue to be eligible for the MHB.

125.   This census growth was due to keeping inappropriate patients through a flawed administrative process designed to keep patients in the system and the willful blindness to necessary diagnostic criteria that may render its patients ineligible for the MHB.

## J.  THE CENSUS EXPERIENCE

126.    During the months of March, June and October of 2003, VITAS' Dade program did not discharge any patients for extended prognosis.

127.    As of March 2004, over 300 of the patients at the VITAS Dade program had lengths of stay that were over 1 ½ years, or approximately seven re-certifications.

128.    In 2001, VITAS' Dade program discharged 1.7% of its patients for extended prognosis.  This number remained steady in 2002.  In 2003, this number fell to .5%.

129.    During the same period, the ADC for VITAS' Dade program grew from approximately 700 in 2001, to approximately 800 in 2002, and approximately 900 in 2003.

130.    During this period of ADC growth, the number of patients that VITAS admitted grew marginally, while those patients discharged for extended prognosis dropped dramatically.

131.    On a company-wide basis, 946, 794 and 780 patients were discharged for extended prognosis in 2001, 2002 and 2003, respectively.

132.    During the same period, VITAS' Dade program discharged 84, 75, and 25 patients for extended prognosis in 2001, 2002 and 2003, respectively.

133.    Between January 1, 2004 and April 8, 2004, VITAS' Dade program discharged only 5 patients for extended prognosis.

134.    VITAS' records reveal that on March 24, 2004, 2,152 of the 8074 patients admitted to VITAS' programs had LOS that equaled or exceeded 240 days.

135.    On or about January 7, 2004, JoAnn Mack, Vice President of Hospice Operations, sent an e-mail message to several VITAS executives where she expressed concern about the census and LOS.

136.    Relator, Ostrom, specifically addressed his concerns about excessive LOS with VP, National Medical Director, Barry Kinzbrunner and VP, Hospice Resources, Patty Houston.

137.    Relator, Ostrom, asked an internal VITAS auditor whether VITAS examined long LOS and was told that it does not.

138.    Relator, Barys, specifically addressed her concerns about excessive LOS with General Manager, Dian Backoff and Vice President, Hospice Operations, Ian Viente.  Barys was told by Backoff to "worry about your own business because VITAS doesn't want Medicare coming into the program again like they did in 1997 when they discharged 100 patients."

139.    Barys was terminated shortly after reporting her concerns about excessive LOS.

140.    Based on Barys' concerns regarding excessive LOS, Barys ran a VITAS report concerning LOS.  This report was in a folder on her desk on the day she was fired by VITAS.

141.    Relators have retained the law firm of Fischman, Harvey & Dutton, P.A. to represent them in this matter and are obligated to pay a reasonable fee for the attorneys' services.

### K.    VITAS' FAILURE TO OBTAIN THE NECESSARY CLINICAL INFORMATION TO RE-CERTIFY PATIENTS FOR THE MHB MAY DEPRIVE PATIENTS OF IMPORTANT INFORMATION RELEVANT TO THEIR HEALTH CARE DECISIONS

142.    VITAS' failure to obtain new data when re-certifying prognosis deprives patients of vital information that they need to make informed decisions concerning their health care needs and the opportunity to know whether there has been an improvement in their prognosis.

143.    By failing to conduct proper medical tests, VITAS is keeping patients in its program whose prognosis may have improved and whose lives may be prolonged if they receive curative medical treatment.

## COUNT I
## FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)

144.    Relators re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 143 of the Complaint.

145.    This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended.

146.    By means of the acts described above, VITAS knowingly presented or caused to be presented false or fraudulent claims for payment of hospice services to the United States Government.

147.    The United States, unaware of the falsity of the claims made by VITAS, and in reliance on the accuracy thereof, paid and continues to pay VITAS for claims that would otherwise not have been allowed.

148.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

WHEREFORE, Relators pray for a judgment against VITAS for the following relief:

a.    Civil penalties for each false claim pursuant to 31 U.S.C. § 3729(a);

b.    Three times the amount of damages proved pursuant to 31 U.S.C. § 3729(a);

c.    Reasonable attorneys' fees, expenses and court costs;

d.    Pre-judgment and post-judgment interest at the maximum rates permitted by law;

e.    An award to the Relators pursuant to 31 U.S.C. § 3730(d) of the appropriate percentage of the amount recovered by the United States as a result of this action; and

f.      Such other and further relief as the Court deems just and proper.

**COUNT II**
**FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(2)**

149.    Relators re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 143 of the Complaint.

150.    This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended.

151.    By means of the acts described above, VITAS knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims for hospice services paid by the United States Government.

152.    The United States, unaware of the falsity of the records or statements made by VITAS, and in reliance on the accuracy thereof, paid and continues to pay VITAS for claims that would otherwise not have been allowed.

153.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

WHEREFORE, Relators pray for a judgment against VITAS for the following relief:

a.      Civil penalties for each false claim pursuant to 31 U.S.C. § 3729(a);

b.      Three times the amount of damages proved pursuant to 31 U.S.C. § 3729(a);

c.      Reasonable attorneys' fees, expenses and court costs;

d.      Pre-judgment and post-judgment interest at the maximum rates permitted by law;

e.      An award to the Relators pursuant to 31 U.S.C. § 3730(d) of the appropriate percentage of the amount recovered by the United States as a result of this action; and

f.      Such other and further relief as the Court deems just and proper.

## COUNT III
## FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(3)

154.    Relators re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 143 of the Complaint.

155.    This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended.

156.    By means of the acts described above, VITAS, its subsidiaries and affiliates conspired to defraud the United States Government by getting false or fraudulent claims allowed or paid.

157.    The United States, unaware of the falsity of the records, statements or claims made by VITAS, and in reliance on the accuracy thereof, paid and continues to pay VITAS for claims that would otherwise not have been allowed.

158.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

WHEREFORE, Relators pray for a judgment against VITAS for the following relief:

a.    Civil penalties for each false claim pursuant to 31 U.S.C. § 3729(a);

b.    Three times the amount of damages proved pursuant to 31 U.S.C. § 3729(a);

c.    Reasonable attorneys' fees, expenses and court costs;

d.    Pre-judgment and post-judgment interest at the maximum rates permitted by law;

e.    An award to the Relators pursuant to 31 U.S.C. § 3730(d) of the appropriate percentage of the amount recovered by the United States as a result of this action; and

f.    Such other and further relief as the Court deems just and proper.

## COUNT IV
## RETALIATORY DISCHARGE CLAIM OF RELATOR, BARYS,
## PURSUANT TO 31 U.S.C. § 3730(h)

159. Relator, Barys, re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 3, 9, 10, 14, 15, 18, 19 through 23, and 138 through 141 of the Complaint.

160. This is an action pursuant to 31 U.S.C. § 3730(h).

161. By virtue of the activities described in paragraphs 138 through 140, *supra*, Barys has engaged in conduct protected under the False Claims Act.

162. VITAS was aware of Barys' actions.

163. VITAS terminated Barys in retaliation for her conduct protected under the False Claims Act.

164. By virtue of her retaliatory discharge by VITAS, Barys has suffered damages.

WHEREFORE, Relator, Barys, prays for a judgment against VITAS for the following relief:

a. Lost compensation based on the same seniority status as she would have had but for the discrimination;

b. Two times the amount of back pay;

c. Interest on the back pay;

d. Compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and

e. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators demand trial by jury on all issues so triable by right.

Dated this 15ᵗʰ day of June, 2004.

> Respectfully submitted,
>
> BRUCE D. FISCHMAN, ESQ.
> Fla. Bar No.: 218472
> E-mail: bruce@fhdlaw.com
> MARIA C. MENENDEZ, ESQ.
> Fla. Bar No.: 195146
> E-mail: maria@fhdlaw.com
> FISCHMAN, HARVEY & DUTTON, P.A.
> 3050 Biscayne Boulevard, Suite 600
> Miami, Florida 33137
> Telephone:  (305) 576-5522
> Facsimile:  (305) 576-7079

# EXHIBIT

# "A"

**Office of Inspector General**

**Publication of the Medicare Advisory Bulletin on Hospice Benefits**

**AGENCY:** Office of Inspector General, HHS.

**ACTION:** Notice.

**SUMMARY:** This Federal Register notice sets forth a recently issued Advisory Bulletin, in conjunction with Operation Restore Trust, that identifies important eligibility and other information involving certain Medicare hospice benefit. This Advisory Bulletin has been made available to consumers, health care professionals and health care associations, and is now being reprinted in this issue of the Federal Register as a means of ensuring public awareness of the purposes of hospice care and the consequences of electing the Medicare hospice benefit.

**FOR FURTHER INFORMATION CONTACT:** Joel J. Schaer, Office of Management and Policy, (202) 619-0089.

**SUPPLEMENTARY INFORMATION:** This Medicare Advisory Bulletin is part of Operation Restore Trust—a joint effort among the Office of Inspector General (OIG), the Health Care Financing Administration (HCFA) and the Administration on Aging within the Department of Health and Human Services to combat fraud, waste and abuse in the Medicare and Medicaid programs. The purpose of this Advisory Bulletin is to inform consumers and health care professionals about certain questionable practices affecting Medicare's hospice program. The issuance calls specific attention to the possible misuse of the hospice benefit, as uncovered through collaborative work undertaken by the OIG and HCFA.

Specifically, the Advisory Bulletin highlights several practices which indicate that some hospice providers may have inappropriately maximized their Medicare reimbursements at beneficiary expense. These practices include:

• Making incorrect determinations of a person's life expectancy for purposes of meeting hospice eligibility criteria;

• Engaging in marketing and sales strategies that offer incomplete or inadequate information about Medicare entitlement under the hospice program to induce beneficiaries to elect hospice and thereby waive aggressive treatment options that Medicare would otherwise cover; and

• Encouraging hospice beneficiaries to temporarily revoke their election of hospice during a period when costly services covered by a plan of care are

needed in order for the hospice to avoid the obligation to pay for such services.

A reprint of this Medicare Advisory Bulletin follows.

Medicare Advisory Bulletin— Questionable Practices Affecting the Hospice Benefit October 1995

The Department of Health and Human Services administers the Medicare program for the benefit of 38 million elderly and disabled Americans. In May 1995, the Secretary of Health and Human Services announced Operation Restore Trust, a joint project of the Office of Inspector General, the Health Care Financing Administration and the Administration on Aging. Among its objectives, Operation Restore Trust seeks to identify vulnerabilities in the Medicare program, and pursue ways to reduce Medicare's exposure to fraud, waste and abuse.

This Advisory Bulletin is a product of Operation Restore Trust. The bulletin describes some potentially abusive practices which have been identified through examination of the Medicare hospice benefit.

*What Is Medicare's Hospice Program?*

The goal of hospice care is to help terminally ill patients continue with their normal activities of daily living as comfortably as possible, while remaining primarily in a home environment. To achieve this goal, the Medicare program shifts the focus of medical attention from curative treatment seeking to reverse an underlying disease or condition to palliative or supportive care, including a wide range of medical, social, and emotional supportive services.

To be eligible for hospice services under Medicare, an individual must be certified as terminally ill by hospice medical staff and the individual's attending physician if he or she has one. Terminal illness is defined as a medical prognosis that the patient's life expectancy is 6 months or less if the terminal illness runs its normal course. The Medicare beneficiary's inclusion in a hospice program is voluntary and can be revoked by the beneficiary at any time.

The decision to elect the hospice benefit has significant consequences because the beneficiary waives the right to receive standard Medicare benefits, related to the terminal illness, including all treatment for the purposes of curing a terminal illness. Hospice coverage is divided into four discrete election periods, during each of which the beneficiary must be certified as terminally ill. The fourth and last election period has an indefinite

duration, unless or until the beneficiary no longer meets the eligibility requirement of a prognosis of 6 months or less to live.

*What Problems Have Been Identified?*

In the course of reviewing trends in Medicare's hospice program, the Office of Inspector General has learned of activities that should be of concern to beneficiaries who are in hospice or who are considering the option of hospice. These questionable practices primarily involve issues of hospice enrollment and are the subject of ongoing analysis by the Medicare program and, in appropriate cases, investigations and audits by the Office of Inspector General. Some hospice providers, in efforts to maximize their Medicare reimbursement, may knowingly engage in one or more of the following activities:

• Making incorrect determinations of a person's life expectancy, for the purposes of meeting hospice eligibility criteria.

• Engaging in marketing/sales strategies that offer incomplete or inadequate information about Medicare entitlement and restrictions under the hospice program, in order to induce beneficiaries to elect hospice and thereby waive other treatment benefits.

• Encouraging hospice beneficiaries or their representatives to temporarily revoke their election of hospice during a period when costly services covered by the hospice plan of care are needed, so that the hospice may avoid the obligation to pay for these services.

*Important Features of the Medicare Hospice Benefit*

• *The hospice benefit is restricted to patients with a diagnosis of terminal illness and prognosis of 6 months or less to live.*

In several recent medical reviews of beneficiary eligibility for hospice, the Office of Inspector General has found significant inaccuracies in the determinations of terminal illness. These findings have prompted a concern that some hospices may intentionally misrepresent a condition as terminal in order to secure Medicare reimbursement. For instance, investigators have encountered hospices that asked nurse employees to alter notes in patients' records or to otherwise misrepresent patients' medical conditions, in order to falsify the existence of a terminal condition.

There have also been cases where physician certifications of terminal illness have been medically questionable. If a hospice submits claims to Medicare under circumstances

where it knows of the absence of a terminal condition, the hospice may be liable for the submission of false claims. Criminal penalties can also be imposed against persons who knowingly and willfully make false representations about a patient's medical condition which are used to determine eligibility for payment of Medicare or Medicaid benefits.

• *A hospice should not refuse to address health care needs relating to a beneficiary's terminal diagnosis.*

Once a Medicare beneficiary elects hospice care, the hospice is responsible for furnishing directly, or arranging for, all supplies and services that relate to the beneficiary's terminal condition, except the services of an attending physician. Hospice beneficiaries have the right to receive covered medical, social and emotional support services from the hospice directly, or through arrangements made by the hospice, and should not be forced to seek or pay for such care from non-hospice providers.

When a beneficiary is receiving hospice care, the hospice is paid a predetermined fee for each day during the length of care, no matter how much care the hospice actually provides. This means that a hospice may have a financial incentive to reduce the number of services provided to each patient, since the hospice will get paid the same amount regardless of the number of services provided.

Medicare has received complaints about hospices neglecting patient needs and ignoring reasonable requests for treatment. One individual reported that his wife's hospice failed on three separate occasions to respond to telephonic requests for emergency services. He was forced to call a non-hospice physician who arranged for hospitalization. His wife's care required a 26-day length of stay. Although the hospital contacted the hospice the day following admission, the hospice did not visit the patient or in any way coordinate her care during the hospital stay.

The Office of Inspector General also has uncovered situations where duplicate claims were submitted by a hospice and other providers (such as skilled nursing homes and hospitals) for services related to the beneficiary's terminal illness. In a nationwide audit of services provided to Medicare beneficiaries enrolled in hospice programs, approximately $21.6 million was improperly paid to hospitals and nursing homes for the treatment of hospice beneficiaries. Hospices are required to make financial arrangements for hospitalization, nursing services and all other health care needs related to the

beneficiary's terminal illness and included in the hospice plan of care. The cost of these services should be paid by the hospices.

• *A beneficiary has a right to expect a hospice to provide complete and accurate information about the consequences of hospice election and revocation.*

A hospice is obligated to inform beneficiaries or their representatives that by electing the hospice benefit, they waive all rights to curative treatment or other standard Medicare benefits related to the terminal illness, except for the services of an attending physician. Some hospices inappropriately induce beneficiaries or their representatives to enroll in the hospice program without explaining that hospice election results in forfeiture of curative treatment benefits under Medicare. For instance, some hospices have solicited the beneficiary's neighbors and friends, who in some jurisdictions may act as beneficiary representatives, and who may not be familiar with the beneficiary's medical condition. In these situations, the beneficiary and/or representative may not appreciate that traditional Medicare benefits will be denied once the hospice benefit is elected.

The Office of Inspector General also has learned of hospices which induce beneficiaries to revoke the hospice election if expensive palliative treatment, even for a temporary period, becomes necessary. As a consequence, beneficiaries may then be burdened with substantial co-payments that would not be charged under hospice. It is especially important to note that when a beneficiary revokes the hospice election during the last election period, re-enrollment in the Medicare hospice benefit will be precluded permanently.

*You Should Be Alert to the Following Questionable Activities*

• Hospice recruiters failing to notify prospective patients or their representatives that they will no longer be entitled to Medicare coverage of curative treatment if they elect the hospice benefit.
• Hospice personnel inducing beneficiaries to revoke their hospice election when more costly treatment is needed.
• A hospice refusing or failing to provide or arrange for needed care;
• Nursing home residents being induced to elect hospice but not receiving the additional benefits of hospice care;
• Non-hospice providers charging Medicare for services to hospice patients that hospices can and should

provide, such as counseling or medical equipment.

*What To Do With Information About Questionable Practices Involving Hospice*

If you have questions about the scope of the hospice benefit or the care you are receiving in hospice, you should first consider discussing these matters with your attending physician or the hospice provider. If you wish to report questionable practices, call or write: 1–800–HHS–TIPS, Department of Health and Human Services, Office of Inspector General, P.O. Box 23489, L'Enfant Plaza Station, Washington, D.C. 20026–3489.

Dated: October 23, 1995.
June Gibbs Brown,
*Inspector General.*
[FR Doc. 95–27217 Filed 11–1–95; 8:45 am]
**BILLING CODE 4150–04–P**

---

## National Institutes of Health

### National Institute of General Medical Sciences; Notice of Cancellation of Meeting

Notice is hereby given of a cancellation of the meeting of the following committee on the National Institute of General Medical Sciences for November 1995, which was published in the Federal Register Notice on September 15, (60 FR 47951).

*Name of Committee:* Genetic Basis of Disease Review Committee.
*Dates of Meeting:* November 6–7, 1995.
*Place of Meeting:* National Institutes of Health, 45 Center Drive, Natcher Building, Room F2, Bethesda, MD 20892–6200.
*Closed:* November 6, 8:30 a.m.—5 p.m., November 7, 8:30 – adjournment.
The meeting was canceled due to administrative complications.

Dated: October 30, 1995.
Susan K. Feldman,
*Committee Management Officer, NIH.*
[FR Doc. 95–27255 Filed 11–1–95; 8:45 am]
**BILLING CODE 4140–01–M**

---

### National Heart, Lung, and Blood Institute; Notice of Meeting

Notice is hereby given of the meeting of the National Heart Attack Alert Program Coordinating Committee, sponsored by the National Heart, Lung, and Blood Institute on Tuesday, December 12, 1995, from 8:30 a.m. to 3:30 p.m. at the Bethesda Marriott Hotel, 5151 Pooks Hill Road, Bethesda, Maryland 20814 (301) 897–9400.

The entire meeting is open to the public. The Coordinating Committee is meeting to examine policies and trends in the emerging managed care

# EXHIBIT

# "B"



**Professional Management of Care → Patient & Family Care Services**

## Certification & Recertification

*WHO (will cover this with you):*  Team Manager Mentor,  PCA or Medical Director

A hospice patient is certified as terminally ill when he/she has been given "a medical prognosis that his or her life expectancy is six months or less".  The initial certification must be supplied by two physicians, one being the Medical Director of the hospice or a physician member of the interdisciplinary team and the second being the individual's attending physician.  *(Please see the chapter on the Clinically Appropriate Patient.)*

The Medicare hospice benefit is divided into periods, two of 90 days each, with periods of 60 days duration ongoing from that time.  Medicaid's (Medical's) hospice benefit now mirrors the Medicare benefit in each state.  Recertification takes place prior to each benefit period.  The hospice Medical Director or Team Physician is required to recertify the patient as terminally ill based on whether or not the patient continues to have a prognosis of six months or less.  Unlike initial certification, only the hospice physician is required to recertify the patient, and at the time of each recertification, the question that must be answered remains the same:

### Is the prognosis of the patient 6 months or less?

This is true whether the patient has been on a hospice program 90 days. 210 days, or longer.

### Recertification of Prognosis

In order to ensure that recertification decisions are made in a timely, efficient manner, and within the 48 hours of due date required by the Federal Regulations, the following procedural guidelines have been developed.

1  The Team Manager should identify patients that are due for recertification approximately **3 weeks** prior to the recertification date.  The actual recertificiation needs to be completed no more than **5 calendar days prior** to the end of the certification period and no later than **2 days after.**

2  Recertification of these patients should be discussed at team meeting

3. If all members of the team, including the VITAS physician, believe that the patient should be recertified, then the VITAS physician will complete the physician recertification note.

**VITAS**°



**Professional Management of Care → Patient & Family Care Services**

4. If there is a question regarding the prognosis of the patient, the VITAS physician should play an active role in recommending the appropriate steps to determine whether the prognosis of the patient has changed. This may require diagnostic studies, a VITAS physician visit, and/or a conversation with the attending physician.

5. After the evaluation is completed and prior to the recertification date, a determination of patient prognosis is made. If the patient still has a prognosis of 6 months or less, they are recertified as described in step three.

6. If the team believes that the patient now has an extended prognosis, the team, after appropriate conversations with the patient, the family, and the attending physician, should arrange to discharge the patient with an extended prognosis, ensuring that substitute support services are provided for the patient and family.

**Physician Recertification Note**

The Physician Recertification Note is designed to standardize documentation that supports patient eligibility for the Medicare Hospice benefit at the time of re-certification. It is completed at the time the re-certification process at the team level occurs (usually about one week prior to the end of the current benefit period). The information required for completing the note is available from multiple sources including, but not limited to:

- *Physician Certification Note*
- *Admission Initial Assessment ID Note.*
- *Nursing Assessment*
- *Psychosocial Assessment*
- *Spiritual Assessment*
- Ongoing nursing assessments (notes)
- ID Care Plans
- Ongoing psychosocial / spiritual assessments (notes)
- Medical records
- Discussion with attending physician
- VITAS physician visit (which requires separate documentation)
- Requested laboratory or diagnostic studies

**VITAS**



**Professional Management of Care → Patient & Family Care Services**

---

**The Physician Recertification Note addresses** (but is not limited to) **the following:**

- Physical Symptoms:
    - → Pain
    - → Shortness of breath
    - → Chest Pain
    - → NYHA Status
    - → Functional Status
    - → Weight
    - → Appetite
    - → Recent Infection / Risk of Infection
    - → Skin Integrity
    - → Level of Consciousness
    - → Other physical symptoms or changes underlying disease process

- Psychosocial Symptoms

- Other documentation supporting terminal illness (frequency of visits, labs, diagnostic studies)

As a Team Manager, it is important that you be aware of the specific processes which must be completed as part of the recertification process as you directly supervise not only this procedure but the Team Physician as well. It is your responsibility to see that the Team Physician takes the lead in facilitating this process and completes those duties which are a part of his/her role as the Team Physician.

In working with physicians who dictate their recertification notes, the format of the VITAS Physician Recertification Note must be followed. If a patient's prognosis is uncertain after initial review, a follow-up note documenting consultation with the Medical Director &/or the Certifying Physician (as is required on the hand written Recertification Note) must either be written or dictated with the appropriate statement of prognosis included at the notes conclusion.

*WHERE:*

Attached are copies of the VITAS Certification of Prognosis Forms, which include

- **Certification of Prognosis:**
    - How to Use Guidelines for Determining Prognosis: Certification
    - How to Use Guidelines for Determining Prognosis: Re-certification
    - Some factors to consider in Re-certification Evaluation

VITAS

Ensuring Service Effectiveness



## Professional Management of Care → Patient & Family Care Services

- **Certification of Prognosis Flowcharts:**
  - Admission Process
  - Process for Re-certification of a prognosis of $\leq$ 6 months

## Vx has reports that help you mange both initial certification & recertification.

<u>Critical Vitals</u>

Certification:

| # 6321 | Medicaid Patient Certification Status by Admit | Run Daily |
| # 7131 | Medicare Patients Missing Written Certification | Run Daily or Review Compass |

Recertification

| # 4886 | Patient Recertification | Do Weekly |

<u>Compass Alarms: Certification</u>

| <u>Category</u> | <u>Contents</u> |
| --- | --- |
| Attending MD Certification | 1. Admit Patient's Attending Certification |
| | 2. Pending Patient Attending MD Certification |
| Hospice MD Certification | 1. Admit Patients Hospice MD Certification |
| Team Management | 1. Admit Patients Hospice MD Certification |

**WINK:**

☑  *Run one of each of the reports outlined (# 6321, 7131 & 4886). Review these reports with your Team Manager Mentor / PCA identifying the key features. Discuss the process for obtaining the missing information.*

☑  *Review with the Medical Director or PCA the Physician Recertification Note discussing each of the areas outlined.*

☑  *Discuss with the Medical Director or PCA some of the inherent challenges within the certification / recertification process and identify solutions to limit them.*

**VITAS**

ENSURING SERVICE EFFECTIVENESS



**Professional Management of Care → Patient & Family Care Services**

☑  *Spend time role playing with the PCA / Team Manager Mentor the certification and recertification process and the discussions which are a part of these processes including appropriate admissions, revocations, and discharges for extended prognosis.*

☑  *Review three patients up for recertification with the team. Utilize the Team Physician to help you facilitate this process. Write up for review by the Team Manager Mentor / PCA whether on not each patient remains hospice appropriate or not. Include three examples supporting your decision on each case.*

☑  ***Educational Tip: Certification and Recertification of Terminal Prognosis***
***It is your responsibility to know regarding Initial Certification that:***
  - *Verbal certification from the hospice physician must be obtained within 2 days.*
  - *Attending physician certification is required within 2 days.*
  - *Record the verbal hospice physician order in the Initial Certification*

VITΛS

ENSURING SERVICE EFFECTIVENESS

# EXHIBIT

# "C"

# VITAS®

# Physician Recertification Note

Side 1 of 2

PATIENT NAME: _____ MR # _____ DATE OF ADMISSION: _____

PRIMARY DIAGNOSIS: _____

OTHER DIAGNOSES OR CO-MORBID CONDITIONS: _____

DATE OF CURRENT BENEFIT PERIOD: _____

DATE RECERTIFICATION DUE: _____

## SUMMARY OF COURSE DURING CURRENT BENEFIT PERIOD

### Physical Symptoms

Pain:   Location _____ Severity Score _____ Change During Period: _____

Interventions & Outcomes: _____

_____

Shortness of Breath:        ☐ At Rest          ☐ w/ Min. Exertion      Change During Period: _____

Interventions & Outcomes: _____

_____

Chest Pain:                 ☐ At Rest          ☐ w/ Min. Exertion      Change During Period: _____

Interventions & Outcomes: _____

_____

NYHA Class: _____

Functional Status:    PPS or ADL Score: _____ Change During Period: _____

Weight, BMI or MMA: _____ Change During Period: _____
     If MMA used, state why weight or BMI could not be obtained:

_____

Recent Infections or Risk of Infection: _____

_____

Skin Integrity: _____ Change During Period: _____

Interventions & Outcomes: _____

Level of Consciousness: _____ Change During Period: _____

Other Physical Symptoms: _____

_____

Psychosocial Symptoms: _____

Other Documentation Supporting Terminal Prognosis (i.e. frequency of visits, laboratory and diagnostic studies, etc.)

_____

_____

Inpatient Care:    Dates: _____ Facility: _____

Indications: _____

Continuous Care:    Dates: _____ Indications: _____

© 1995 VITAS Healthcare Corporation
VITAS: In Florida at the corporate office, VITAS Healthcare Corporation; in south Florida programs, VITAS Healthcare Corporation of Florida, a subsidiary of VITAS Healthcare Corporation; in central Florida, VITAS Healthcare Corporation of Central Florida, a subsidiary of VITAS Healthcare Corporation; in Ohio, VITAS Healthcare Corporation of Ohio, a subsidiary of VITAS Healthcare Corporation; in Pennsylvania, VITAS Healthcare Corporation of Pennsylvania, a subsidiary of VITAS Healthcare Corporation; in Illinois, VITAS Healthcare Corporation d/b/a VITAS Corporation; in Texas and Wisconsin, VITAS Healthcare Corporation; in California, VITAS Healthcare Corporation of California, a subsidiary of VITAS Healthcare Corporation.

Form 141402 Side 1 of 2  (Rev.01/01)

# Physician Recertification Note

*Side 2 of 2*

## STATEMENT OF PROGNOSIS

❑ Based upon the above, it is my clinical judgement that the patient, _____ ,
                                                                                                *(name)*

remains terminally ill with a prognosis of six months or less if the illness runs its normal course, and; therefore, is recertified for the benefit

period beginning _____ .

_____          _____
    *(Signature of Certifying Physician)*                    *(Date of Signature)*

❑ Based upon the above, the patient's prognosis is uncertain, and consultation will be obtained with the Medical Director.

_____          _____
    *(Signature of Certifying Physician)*                    *(Date of Signature)*

## CONSULTATION WITH MEDICAL DIRECTOR

Results of Consultation _____

_____

_____

_____

❑ After consultation with the Medical Director, it is my clinical judgement that the patient, _____ ,
                                                                                                                              *(name)*

remains terminally ill with a prognosis of six months or less if the illness runs its normal course, and; therefore, is recertified for the benefit

period beginning _____ .

_____          _____
    *(Signature of Certifying Physician)*                    *(Date of Signature)*

❑ After consultation with the Medical Director, it is my clinical judgement that the patient, _____ .
                                                                                                                              *(name)*

now has a prognosis greater than six months, and will be discharged from the hospice program after appropriate discharge planning.

_____          _____
    *(Signature of Certifying Physician)*                    *(Date of Signature)*

FILED UNDER SEAL AND IN CAMERA
PURSUANT TO 31 USC SEC. 3730(b)(2)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

EVE BARYS and DWAYNE OSTROM, on behalf of the United States of America and the State of Florida,

## DEFENDANTS

VITAS HEALTHCARE CORPORATION, VITAS HOSPICE SERVICES, LLC, VITAS HEALTHCARE CORPORATION OF FLORIDA, ET. AL.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Fischman, Harvey & Dutton, P.A.
3050 Biscayne Blvd., #600, Miami, 33133

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

- X  1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)  AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

- X 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | A☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | X 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | A☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Relators bring action on behalf of U.S. and State of Florida pursuant to False Claims Act, 31 U.S.C. 3729, et.seq.

LENGTH OF TRIAL via ____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE _____   DOCKET NUMBER _____

DATE  6/15/04

SIGNATURE OF ATTORNEY OF RECORD   Bruce Dutton

FOR OFFICE USE ONLY

RECEIPT # ____  AMOUNT ____  APPLYING IFP ____  JUDGE ____  MAG JUDGE ____

[vdkttext]

Case Selection
Dkt type: cv   Case Number: 04-21431   Division: 1   Miami


```
Filed        Entry Date  Last Update       History ID      Docketed by
6/15/04      6/16/04     **/**/**           6304240            cj
    +------------------------------------------------------------+
     SEALED DOCUMENT placed in vault



    +viewing docket text----------------------------------------+
Transaction: seal doc -/ -/ - - -
```

 Command mode (? for commands)