UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  04-21431 CIV-JORDAN/TORRES

EVE BARYS and DWAYNE OSTROM,
on behalf of the United States of America
and the State of Florida,

              Plaintiffs,

vs.

VITAS HEALTHCARE CORPORATION,
VITAS HOSPICE SERVICES, LLC
VITAS HEALTHCARE CORPORATION OF
FLORIDA, ET AL.,

              Defendants.
_____/

**AMENDED QUI TAM COMPLAINT
AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.        Relators, EVE BARYS (hereinafter "Barys") and DWAYNE OSTROM (hereinafter "Ostrom") bring this action on behalf of the United States of America and the State of Florida against Defendants, VITAS HEALTHCARE CORPORATION, VITAS HOSPICE SERVICES, LLC, VITAS HEALTHCARE CORPORATION OF FLORIDA, and all other corporations or other legal entities in the United States of America which are owned, in whole or in part, or operated by VITAS Healthcare Corporation and who billed Medicare and Medicaid for the claims referenced in Redacted Exhibit "A" (hereinafter, "VITAS"), for treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. 3729, *et seq.,* and the State of Florida False Claims Act, 68.081 –

68.092, Florida Statutes.  The violations arise out of Defendants' false claims based on submissions for payment and payments from Medicare, Medicaid and intermediaries (hereinafter "Government" or "Plaintiffs") as more fully set forth herein and in the Exhibits attached hereto or filed with the Court under seal.

2.     The Relators have complied with the False Claims Act in that they have served a copy of the Qui Tam Complaint and written disclosure of substantially all material evidence and information the Relators possess upon the United States Attorney General and the United States Attorney for the Southern District of Florida. 31 U.S.C.A. § 3730(a)(2). They have also served this Amended Complaint in a similar manner.

3.     The Relators have complied with the Florida False Claims Act in that they have served a copy of the Qui Tam Complaint and written disclosure of substantially all material evidence and information the Relators possess upon the Attorney General of the State of Florida, as head of the department, and on the Chief Financial Officer, as head of the Florida Department of Financial Services. Fla. Stat. § 68.083(3). They have also served this Amended Complaint in a similar manner.

## PRELIMINARY STATEMENT OF VITAS' FRAUDULENT CONDUCT

4.     VITAS is the largest provider of hospice services in the United States.  In the first quarter of 2004, VITAS' average daily census ("ADC") of claimed hospice appropriate patients was 8,097. These are patients for whom VITAS submitted claims for reimbursement to Medicare and/ or Medicaid based on the scheduled and allowable hospice reimbursement rates.

5.     Payments from Medicare and Medicaid to VITAS were made for per diem services.

6.          All states in which VITAS operates, and which are reference herein, provide Medicaid reimbursement for hospice services. Reimbursement rates are at least as much as the Medicare per diem reimbursement rate.

7.          VITAS billed and received payments from Medicare and Medicaid for all levels of hospice care. VITAS automatically billed Medicare and Medicaid for each per diem unit of service electronically through its patient electronic information system or VX, also known as "Vitas Exchange."  VITAS billed between the first and the fourth of each and every month depending upon the business work week and covering all billing days ("billed units") for the prior month.

8.          A patient care manager or patient care secretary entered into the VX system the HICN number for the patient (his or her Medicare ID number), patient social security number, patient name, patient address, admission date, recurring revenue code, procedure code, patient date of birth, patient date of death, referring UPIN number (physician number) UPIN name, provider number for the  VITAS billing entity, and the patient's primary diagnosis.  VX assigned a billing unit of one (1) for each day during the month that the patient received service.  Claims were automatically calculated by the system as billed charges based on the allowable hospice reimbursement rate for the revenue code, times the number of units.

9.          The  VX  system  automatically  generated  monthly  electronic  billings  and electronic data interchange (EDI) information on electronic form UB-92-1450 for care provided under the hospice benefit and electronic form UB-92-1500 for the room and board benefit, all pursuant to the Administration Simplification Compliance Act (ASCA) and automatically submitted the claims to the CMS intermediary for VITAS, Palmetto GBA, unless the patient was deleted.

10.         All patients and claims on Redacted Exhibit "A" were billed.  A copy of the actual  electronic  claims  records  for  patient  numbers  00465755-7, 00521572-8, 00427556-6,

00512957-2,  00411135-7,  00509570-8,  00462179-3,  00455716-1,  00390841-5,  00432013-1, 00505345-9, 00490865-3, 00403598-6 and 00490219-3 are attached hereto in redacted form as Redacted Exhibit "B."   The complete unredacted records have been filed under seal in this case as Exhibit "B," to protect the privacy of the patients.  Redacted Exhibit "B" includes an ID number reflecting the tag or line item on the electronic billing spreadsheet, DCN number (a tracking number for each claim), admission date, billing dates range for each of said patient's claims, revenue code, billed charges, covered charges, billed units and covered units.

11.      Exhibit "B," filed under seal, includes the HICN number, patient name, address, DCN number, admit date, from and through dates, revenue code, procedure code, billed charges, covered charges, billed units, covered units, provider paid, amount, paid date, primary diagnosis, date of birth, date of death, referring UPIN, UPIN name, provider number, and provider name.

12.      Payment from the intermediary for the claims listed on Redacted Exhibit "A," Redacted Exhibit "B," and Exhibit "B" filed under seal, were made by direct deposit to VITAS' financial institutions pursuant to electronic funds transfers (ETF), in compliance with the rules and requirements for ETF and electronic billing and EDI transactions as promulgated by the U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services.

13.      A copy of the actual electronic records of payment for the patient numbers 00465755-7,  00521572-8,  00427556-6,  00512957-2,  00411135-7,  00509570-8,  00462179-3, 00455716-1, 00390841-5, 00432013-1, 00505345-9, 00490865-3, 00403598-6 and 00490219-3 are attached hereto in redacted form as Redacted Exhibit "C."  The complete unredacted records have been filed under seal in this case as a part of Exhibit "B."

4

14.      Home care billing averaged $123 per diem per patient. In patient billing averaged $545 per diem per patient. Continuous care billings averaged $542 per diem per patient. Room and board for an in patient averaged $135 per diem per patient.

15.      At all times material hereto, in excess of 95% of the net patient service revenue of VITAS consisted of payments from the Medicare and Medicaid programs for hospice benefit units claimed by VITAS.

16.      The false claim patients listed on Redacted Exhibit "A" attached hereto and more fully listed on Exhibit "A" filed under seal were billed by VITAS' VX system automatically each month for each day of service, and VITAS received payment from Medicare and Medicaid for the same.

17.      Ostrom, based on his positions of employment with VITAS since 1990 and through 2004, and based on his position as Vice-President with VITAS, had first hand personal knowledge of the VITAS re-certification practices complained of herein, the VITAS internal billing practices and procedures, the "VX" information management system, and the submission of the subject false claims to Medicare and Medicaid by recertifying and billing the patients referenced on Exhibit "A" when they were no longer eligible for the Medicare/Medicaid Hospice benefit.  He had full access and passwords to search and did search the patient information, billing and claims information, discharge information, length of stay information, and other related information stored in the data bases of VX.

18.      Barys, based on her employment with VITAS since 1997 and through her termination in 2004, had first hand and personal knowledge of the re-certification practices regarding VITAS patients that were no longer eligible for the Medicare/Medicaid Hospice benefit. She also had access to limited portions of the VX database necessary for her job functions and duties.

19.        VITAS knowingly, deliberately, and systematically overcharged federal and state health care programs for hospice services rendered to patients who were ineligible for the hospice benefits provided by those programs as set forth on Redacted Exhibits "A," "B" and "C," and Exhibits "A" and "B," filed under seal.

20.        VITAS submitted the false claims referenced and for the patients referenced on Redacted Exhibit "A" and Exhibit "A," filed under seal, and received payment from the government for the false claims in the approximate sum of $53,401,000.

21.        Exhibit "A" and Redacted Exhibit "A" reflect data in Relators' possession for March 24, 2004 from the VX information management system for active patients for whom VITAS had billed Medicare and Medicaid and received payments, and additional information extrapolated there from by the Relators.  Exhibit "A," under seal, includes each patient by name, VITAS patient number, date of birth, FC code (The first letter references who pays for the hospice benefit, the second letter references if a secondary payor is involved and the third letter references who pays for room and board - M=Medicare, N=Medicaid, and X=inapplicable), social security number, admission date, the length of stay (LOS) for the patient, number of false claim days billed, the number of re-certification's per patient, the number of false claims for the patient through March 24, 2004 and the estimated monthly dates the false claims per patient were filed with the governmental entity and its intermediary, and treatment location by number and geographic description.

22.        The complete list referenced as Exhibit "A," under seal, has been redacted to protect the privacy of the patients and their families.  The Redacted Exhibit "A" attached to the Amended Complaint includes patients by list number, VITAS patient number and admission date. Actual names, social security numbers and dates of birth have been deleted from the Redacted exhibit. However, Defendants have full access to the original exhibit and all of the patient data

6

relating to each patient number on their VX electronic information management system and under seal so as to give Defendants sufficient detail of time, place and substance of each alleged fraudulent claim.

23.     The initial certification requires that the patient have a life expectancy at that time of 6 months or less if the illness runs its normal course to qualify for the Hospice benefit. The benefit provides for two initial 90 day benefit periods followed by 60 day periods. Each of these re-certification periods requires that the patient have a life expectancy at that time of 6 months or less if the illness runs its normal course. It is alleged herein by the Relators that the patients and claims at issue herein did not qualify for the hospice benefit since the patients did not have a life expectancy at the time of the applicable claim of 6 months or less if the illness ran its normal course or the re-certification note and supporting documentation at the time did not support such qualification.

24.     The fraud and false claims described herein occurred at VITAS' programs in the geographic locations listed in Redacted Exhibit "A" and Exhibit "A," under seal, which included programs 11, 14, 16, 17, 18, 21, 24, 27, 29, 31, 34, 37, 38, 39, 51, 61, 65, 66, 67, 92, 93, 94, 95, 96, 97 and 98 in the geographic locations of Miami-Dade, Broward, West Palm Beach, Central Florida and Brevard, Florida; Dallas, Ft. Worth, Houston and San Antonio, Texas; Chicago Northwest, Chicago North, Chicago South and Chicago Central, Illinois; Milwaukee, Wisconsin; Cincinnati, Ohio; Philadelphia, Pennsylvania; New Jersey Shore, New Jersey West, New Jersey North, New Jersey; and, Inland Empire, Orange, Coastal, San Diego, San Gabriel, San Fernando and San Francisco Bay, California

## ORIGINAL COMPLAINT FILED UNDER SEAL

25.     This original Complaint was filed *in camera* pursuant to 31 U.S.C. § 3730(b)(2) and was unsealed by the Court and served on the Defendants pursuant to the Court's order.

## JURISDICTION AND VENUE

26.     This court has subject matter jurisdiction for this Federal False Claims Act claim brought on behalf of the United States Government pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

27.     This court has subject matter jurisdiction for this Florida False Claims Act claim brought on behalf of the State of Florida pursuant to 28 U.S.C. § 3732(b).

28.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c).

## PARTIES

29.     The Relators are suing in the name of and on behalf of Plaintiff, UNITED STATES, pursuant to the provisions of 31 U.S.C. § 3730(b)(1).

30.     The Relators are suing in the name of and on behalf of the Plaintiff, STATE OF FLORIDA, pursuant to the provisions of Fla. Stat. § 68.083(2).

31.     Barys is a citizen of the United States and at all times material hereto a resident of the State of Florida.

32.     Barys brings this action based upon her direct knowledge gained while employed by VITAS since 1997 and through March 2004, and as Director of Admissions.

33.     Ostrom is a citizen of the United States and at all times material hereto a resident of the State of Florida.

34.     Ostrom brings this action based upon his direct and personal knowledge gained while employed by VITAS since 1990 and through July 2004, in numerous positions and as Vice President – Hospice Operations Support.

35.     The Relators are the original source of the information.

36.     Defendant, VITAS HEALTHCARE CORPORATION, is a Delaware corporation with its principal place of business in Miami, Florida and is authorized to do business in Florida.  Its registered agent for service of process in Florida is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

37.     Defendant, VITAS HOSPICE SERVICES, LLC, is a Delaware limited liability company with its principal place of business in Miami, Florida and is authorized to do business in Florida.  Its registered agent for service of process in Florida is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

38.     Defendant, VITAS HEALTHCARE CORPORATION OF FLORIDA, is a Florida corporation with its principal place of business in Miami Florida.  Its registered agent for service of process in Florida is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

39.     At all times material hereto, Defendant, VITAS, and its subsidiaries and affiliates, acted through its employees, agents, and independent contractors.

40.     At all times material hereto, the acts of Defendants' employees, agents and independent contractors were within the scope of their agency and employment.

## BACKGROUND

### A.  HOSPICE CARE

41.     Hospice care is an approach to caring for terminally ill individuals.  Hospice services are intended to provide comfort and pain relief for a dying, as opposed to curative care, which seeks to reverse the underlying disease or condition.

42.     Hospice services may be provided in a patient's home, a hospital, a nursing home or private hospice facility.

## B.  THE MEDICARE PROGRAM

43.        In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare") to pay for the cost of certain medical services for persons aged 65 and older, certain persons with disabilities and persons with kidney failure.

44.        The U.S. Department of Health and Human Services ("HHS") administers the Supplementary Medical Insurance Program for the Aged and Disabled ("Medicare") through the Centers for Medicare & Medicaid Services ("CMS"), a division of HHS formerly known as the Health Care Financing Administration ("HCFA").

45.        The Medicare program has two parts:  Medicare Part A ("Hospital Insurance Program") provides for care in or by institutional providers, such as hospices, within specified limits. *See* 42 U.S.C. § 1395c, *et seq.*  Medicare Part B ("Supplemental Medical Insurance Program") pays for physician services and a variety of outpatient services.  *See* 42 U.S.C. § 1395 j, *et seq.*

46.        In order to participate in the Medicare program, a health care provider must enter into an agreement ("Provider Agreement") with the Secretary of HHS.  §1395cc.  After entering into a Provider Agreement, Medicare directly reimburses the provider for the reasonable cost of services provided to Medicare patients.

47.        Under Medicare regulations, the term "provider" means a hospital, a critical access hospital, a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency, or a hospice that has in effect an agreement to participate in Medicare, or a clinic, a rehabilitation agency, or a public health agency that has in effect a similar agreement but only to furnish outpatient physical therapy or speech pathology services, or a community mental health center that has in effect a similar agreement but only to furnish partial hospitalization services. 42 CFR § 400.202.

10

48.     A provider must comply with the requirements of the Medicare and Medicaid programs in order to be eligible to receive payments from these programs for hospice services.

49.     Since their enactment and implementation, the Medicare and Medicaid programs have enabled the elderly, disabled and low-income patients to obtain necessary medical services. One factor that is critical to the viability and solvency of these programs is that providers bill the payors only for those services that are provided to individuals who are duly eligible for benefits pursuant to program rules and regulations.

50.     The Medicare and Medicaid programs are based on trust and are vulnerable to fraud and abuse.

51.     "The most frequent kind of [Medicare] fraud arises from a false statement or misrepresentation made, or caused to be made, that is material to entitlement or payment under the Medicare program," such as the "[i]ncorrect reporting of diagnoses or procedures to maximize payments." Medicare Program Integrity Manual, Ch. 1, § 3.1 – Examples of Medicare Fraud – (Rev. 3, 11-22-00).

52.     In May 1995, the Secretary of HHS announced "Operation Restore Trust" ("ORT"), a joint project of the Office of the Inspector General ("OIG"), HCFA and the Administration on Aging.

53.     ORT sought, *inter alia,* the identification of vulnerabilities in the Medicare Program and reduction of Medicare's exposure to fraud, waste and abuse.

### C.  THE MEDICAID PROGRAM

54.     Medicaid was enacted in 1965 to pay for the cost of certain medical services for low-income patients.

55.     CMS also works in partnership with the states to administer Medicaid.

56.     The United States and state governments that choose to participate in the program share Medicaid funding.  The Medicaid program mirrors Medicare in every participating state.

57.     The Agency for Health Care Administration of Florida ("AHCAF") administers Florida's Medicaid program.

### D.  MEDICARE HOSPICE BENEFIT

58.     The Medicare Hospice Benefit ("MHB") was passed as part of the Tax Equity and Fiscal Responsibility Act ("TEFRA") of 1982.

59.     Under Medicare regulations, in order to be eligible for the MHB an individual must be entitled to Part A of Medicare and a doctor must certify that the patient has a terminal disease and less than 6 months to live if the disease runs its normal course. 42 C.F.R. § 418.20.

60.     An individual who meets the eligibility requirement for the MHB must file an election statement setting forth, *inter alia*: 1) the particular hospice that will provide care to the individual; 2) acknowledgement that the individual or individual's representative has been given a full explanation of the nature of hospice care as opposed to curative care; 3) acknowledgement that certain Medicare services are waived by the election of the MHB.  42 C.F.R. § 418.24(b).

61.     For the duration of an election of hospice care, MHB beneficiaries waive all rights to Medicare payments for services that are related to the curative treatment of the condition for which hospice care was elected. 42 C.F.R. § 418.24(d).

62.     Once a beneficiary elects the MHB, the hospice is paid a predetermined fee for each day the patient receives care, regardless of the amount of care that the hospice provides.

63.     Medicare regulations require that a hospice must designate an interdisciplinary group ("ID Group") or groups comprised of hospice employees that include at least the following: 1)

a doctor of medicine or osteopathy; 2) a registered nurse; 3) a social worker; and 4) a pastoral or other counselor. 42 C.F.R. § 418.68(a).

64.     The ID Group is responsible for participation in the establishment of the plan of care, provision or supervision of hospice care and services, periodic review and updating of the plan of care for each individual receiving hospice care, and establishment of policies governing the day-to-day provision of hospice care and services.  42 C.F.R. § 418.68(b).

65.     Medicare regulations require that a hospice maintain a clinical record for each patient.  42 C.F.R. § 418.74.

66.     Each patient's clinical record must contain 1) the initial and subsequent assessments; 2) the plan of care; 3) identification data; 4) consent and authorization and election forms; 5) pertinent medical history; and 6) complete documentation of all services and events (including evaluations, treatments, progress notes, etc.).  42 C.F.R. § 418.74(a).

67.     A patient's clinical record must be sufficient to support MHB claims in that it must contain documentation to support the patient's prognosis at the time of each re-certification that the patient has a terminal disease and has  6 months or less to live if the disease runs its normal course.

68.     Medicare regulations define Terminally Ill as "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  42 C.F.R. § 418.3.

69.     The MHB is divided into the following benefit periods:  1) the initial 90-day period; 2) one subsequent 90-day period; and 3) 60-day benefit periods.  42 U.S.C. § 1395d(a)(4).

70.     In the initial 90-day benefit period, the individual's attending physician and the medical director or physician member of the interdisciplinary group of the hospice program

providing or arranging for the care must each certify in writing at the beginning of the period that the patient is Terminally Ill.  42 U.S.C. § 1395f(a)(7).

71.     After the initial certification, a physician must re-certify that the patient is Terminally Ill and recertify at the beginning a second 90-day period and every 60 days thereafter. 42 U.S.C. § 1395f(a)(7).

72.     The certification or re-certification "must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course."  42 C.F.R. § 418.22.

73.     The certification and re-certification of a patient's eligibility for the MHB must be based on the physician's clinical judgment regarding the normal course of the individual's illness with respect to whether the individual patient's prognosis is 6 months or less if disease state runs its normal course.  42 U.S.C. § 1395f(a)(7).

74.     While a beneficiary may potentially be eligible for an unlimited number of benefit periods, a physician must properly and conscientiously re-certify the six-month prognosis using clinical data for a beneficiary to continue to receive the MHB.

75.     Under the Medicare program, the accurate and truthful certification and re-certification by a physician of a beneficiary's eligibility for the MHB at the beginning of each benefit period is material to entitlement and payment of the MHB by Medicare.  42 U.S.C. § 1395f(a)(7).

76.     In Sept. 2000, the United States General Accounting Office ("GAO") published a Report to Congressional Requesters, entitled "MEDICARE:  More Beneficiaries Use Hospice but for Fewer Days of Care" ("GAO Report").  This Report sets forth the results of the GAO's analysis

of HCFA claims and enrollment provider data for the period from November 1999 through August 2000.  GAO Report, p. 3-4.

77.     According to the GAO Report,    "[t]he average period of hospice use declined from 74 days in 1992 to 59 days in 1998."

78.     Not all patients who are appropriate for hospice are eligible for the MHB.

79.     In cases where patients are not eligible for the MHB, alternative modes of reimbursement for hospice services can be sought, often through community support.

### E.  MHB FRAUD AND ABUSE

80.     In 1995, the OIG and HHS issued a Medicare Advisory Bulletin on Hospice Benefits, entitled, "Questionable Practices Affecting the Hospice Benefit October 1995," "to inform consumers and health care professionals about certain questionable practices affecting Medicare's hospice program" and to call "specific attention to the possible misuse of the hospice benefit," as uncovered by ORT. 60 Fed. Reg. 55,721 (1995).  A copy of the Federal Register notice setting forth the Bulletin is attached hereto as Exhibit "D."

81.     According to the Bulletin, among the problems identified through ORT were that providers, "in efforts to maximize their Medicare reimbursement," may knowingly make incorrect determinations of prognosis for the purposes of meeting eligibility requirements for the MHB.  60 Fed. Reg. 55,721.

82.     The Bulletin states that *"[t]he hospice benefit is restricted to patients with a diagnosis of terminal illness and prognosis of 6 months or less to live."*  60 Fed. Reg. 55,721 (emphasis in original).

83.     The Bulletin further states, in pertinent part:

> There have also been cases where physician certifications of terminal illness have been medically questionable.  If a hospice submits claims to Medicare under

circumstances where it knows of the absence of a terminal condition, the hospice may be liable for the submission of false claims.

60 Fed. Reg. 55,721-55,722.

84.       The Bulletin puts hospice providers, including VITAS, on notice that they will be liable for the submission of false claims if they submit medically questionable certifications of patients' eligibility for the MHB.

### F.  VITAS HEALTHCARE CORPORATION

85.       Hospice Care, Inc., which changed its name to VITAS in 1992, began operations in South Florida as a non-profit corporation in 1978.

86.       In the early 1980s, VITAS participated in the National Hospice Education Program, a grass-roots campaign to promote Medicare coverage of hospice care.

87. Soon after Congress passed the MHB, Hospice Care, Inc. changed to a for-profit corporation.

88.       In December 2003, VITAS Healthcare Corporation entered into a merger agreement with Rotor-Rooter, Inc., a publicly-traded corporation, with VITAS surviving the merger as an indirect wholly-owned subsidiary of Rotor-Rooter, Inc.

89.       Rotor-Rooter, Inc. changed its name to Chemed Corp.; its new symbol on the New York Stock Exchange is CHE.

90.       "VITAS classifies its services based on the location and type of care delivery" into three categories:  1) Home Care, which is "routine care provided to patients and their families residing at home or in a nursing facility." 2) Inpatient Care, which is "short-term care provided in a participating hospice unit, hospital or nursing facility that meets hospice standards." 3) Continuous Care, which is "care provided to patients at home, during periods of crisis when intensive monitoring

and care, primarily nursing care, is required to achieve palliation or management of acute medical symptoms." Rotor-Rooter, Inc., Form 8K (2/24/2004).

91.     In 2003, VITAS average daily reimbursement rates for Home Care, Inpatient Care and Continuous Care were $122.70, $544.98 and $541.88, respectively.  Rotor-Rooter, Inc., Form 8K (2/24/2004).

92.     In the fiscal year 2003, 68.8% of VITAS revenues were from Home Care, 16.9% from Continuous Care and 14.3% from Inpatient Care.  Rotor-Rooter, Inc., Form 8K (2/24/2004).

93.     Currently, "VITAS is the largest provider of hospice services in the United States in terms of both average daily census and net revenue from patient services."  Rotor-Rooter, Inc., Form 8K (2/24/2004).

94.     "In the five years ended September 30, 2003, VITAS increased its patient census by 51% primarily as a result of growth of existing programs." Rotor-Rooter, Inc., Form 8K (2/24/2004).

95.     "In 2003, VITAS' net patient revenue was $420.1 million, which represents a 17% increase over fiscal 2002 net patient revenue of $359.2 million and a 31.5% increase over fiscal 2001 net patient revenue of $319.5 million."  Rotor-Rooter, Inc., Form 8K (2/24/2004).

96.     VITAS' largest programs are in Miami-Dade County, Florida and Broward County, Florida.

97.     At all times material hereto, VITAS and its related entities were participating Medicare and Medicaid providers.

### G.  VITAS IS HIGHLY DEPENDENT ON PAYMENTS FROM MEDICARE AND MEDICAID

98.        95.2%, 95.4% and 95.4% of VITAS' net patient services revenue for the years ended September 30, 2001, 2002 and 2003, respectively consisted of payments from the Medicare and Medicaid programs.  Rotor-Rooter, Inc., Form 8K (2/24/2004).

99.        Medicare and Medicaid payments are made on a "per diem" basis, subject to an annual expenditure cap. Rotor-Rooter, Inc., Form 8K (2/24/2004).

### H.  VITAS VIOLATED THE FALSE CLAIMS ACT BY IMPROPERLY CERTIFYING PATIENT ELIGIBILITY

100.        At all times material hereto, VITAS, as the largest provider of hospice services, is and has been aware of the requirement that the Medicare program only pays for hospice care administered to beneficiaries who have been properly certified or re-certified as eligible for the MHB.

101.        VITAS submitted claims to the United States and the Medicaid programs for payment for services rendered to patients based on the false re-certification of patients by their team physicians and medical directors as eligible for the MHB as specifically set forth on Redacted Exhibit "A" and Exhibit "A," under seal, and as evidenced by the actual billings and payments referenced in Redacted Exhibits "B" and "C," and Exhibit "B" under seal.

102.        VITAS policies and practices were designed to keep patients in the Vitas Hospice program when they should have been discharged or transferred based on an extended prognosis, in

order to increase average daily patient census, and increase net patient revenues in violation of Medicare and Medicaid regulations.

103.     VITAS implemented a system to promote the re-certification of patients for the MHB absent a physician's proper and conscientious clinical judgment concerning patients' prognosis as is required by the Medicare program.

104.     VITAS policies for re-certification of patients for the MHB did not adhere to Medicare regulations in that VITAS continuously and systematically failed to obtain necessary information for the proper clinical determination of the individual prognosis of the patients under its care for each benefit period and re-certifications listed as a false claim herein.

105.     Through its policies and procedures, VITAS promoted team members' willful blindness to material information that is necessary in order to determine whether a patient remained eligible for the MHB.

106.     The VITAS documents, "Process for Recertification of Prognosis of $\leq 6$ Months" and ("process flowchart") and "Team Manager Compass Guide," ("Compass")are training guides for team managers, medical directors, team physicians and others at VITAS involved in the decision making process of re-certifying a patient or releasing a patient from VITAS and hospice care because the patient does not qualify for the benefit. The Compass was available to VITAS employees and team physicians on their computers and in hard copy at all times material hereto. Copies are attached hereto as Exhibit "E."

107.     The Team Manager is responsible for supervising the re-certification process and the Team Physician.

108.     However, the Compass and the process flowchart point in the wrong direction, as they direct VITAS employees to re-certify patients for the MHB absent pertinent clinical

information that would be required in order for a physician to properly and conscientiously re-certify a patient's eligibility for the MHB.

109.     VITAS re-certified patients for the MHB absent current lab work, diagnostic techniques or physician contact in order to save costs.

110.     A VITAS physician cannot accurately re-certify a VITAS patient concerning a patient's prognosis where the necessary clinical data is not currently available.

111.     Approximately two weeks prior to the end of a patient's MHB benefit period, a Team Meeting is held that is attended by at least the VITAS physician, registered nurse, chaplain, and social worker to determine whether the patient should be re-certified for the MHB.

112.     The Compass states that "[i]f all the members of the team, including the VITAS physician, believe that the patient should be recertified, then the VITAS physician will complete the physician certification note."  See Exhibit "E," ¶ 3.

113.     The second page of VITAS' pre-printed Physician Re-certification Note contains the following certification:

> Based upon the above, it is my clinical judgement (sic.) that the patient, [patient's name], remains terminally ill with a prognosis of six months or less if the illness runs its normal course, and; therefore, is recertified for the benefit period beginning [date].

A copy of VITAS' form, "Physician Re-certification Note, Form 141402 (Rev. 01/01) ("Physician Re-certification Note"), is attached hereto as Exhibit "F."

114.     The Physician Re-certification Note also contains a section whereby, if the patient's prognosis is uncertain, the certifying physician notes that "[b]ased upon the above, the patient's prognosis is uncertain, and consultation will be obtained with the Medical Director."  The following section of the form contains a space for the physician to note the results of the consultation with the Medical Director.  See  Exhibit "D," p. 2.

115.     The Compass includes factors to consider during the re-certification process.  One of these factors is as follows:

- Recognize that patients who have good symptom control may feel better and seem to improve.  If the underlying terminal illness still exists, however, the prognosis should be the same, and the patient should be recertified.

116.     Under Medicare rules, the re-certification of a patient should be based on a physician's clinical judgment of the patient's prognosis.  The continued existence of the terminal illness that initially made the patient eligible for the MHB, in the absence of other current clinical information concerning prognosis, is insufficient to warrant re-certification for the MHB.

117.     VITAS also instructs its employees as follows:

- Patient and family wishes need to be considered.  If the patient's terminal illness may not appear to be progressing due to good symptom management, and the patient and family still desire a palliative approach to care, then the patient should be recertified.

118.     Here, VITAS is instructing its employees to deviate from Medicare regulations by taking the patient and family's desires into account when re-certifying a patient for the MHB under circumstances that may indicate that the patient's prognosis has improved.

119.     In the event that the panel at the Team Meeting determines that laboratory testing should be performed in order to re-certify a patient for the MHB, the two-week period between the team meeting and the beginning of the next benefit period is often insufficient to allow for testing of the patient prior to the start of the next benefit period.  Additionally, the process flowchart does not provide for laboratory or radiological studies that would be helpful in confirming prognosis, unless the team does not recommend re-certification.

120.     At the Team Meetings, VITAS re-certified the patients on Redacted Exhibit "A" and Exhibit "A," under seal, for the MHB without a physician properly and conscientiously re-certifying the six-month prognosis.

121.     VITAS re-certified patients for the MHB without a physician visit or new clinical data, relying instead on notes of R.N. visits and the results from the original, pre-admission diagnostic tests that were initially used to certify the patient for the MHB.     Additionally, the process flowchart does not provide for the physician to visit or to discuss the patient with the attending physician unless the team does not recommend re-certification.

122.     A VITAS patient receiving home care periodically receives visits by a Registered Nurse.

123.     A physician did not visit most VITAS patients during the re-certification process.

124.     Under VITAS' policy for the re-certification of a patient's prognosis, a physician is required to take the active steps necessary to make a clinical determination of a patient's prognosis, such as diagnostic studies, a physician visit and/or a conversation with the attending physician, only if the patient's prognosis is questioned by a team member at the Team Meeting, which may be an employee with no clinical training such as a home health aide, social worker or chaplain.  Exhibit "E," ¶ 4.

125.     If a patient is determined to be inappropriate for continued hospice care at a Team Meeting, VITAS' policy is to initiate another layer of administration.  Before discharge from the program is allowed, and in an effort to keep the patient at VITAS and continue billing, the patients selected for discharge from hospice at the Team Meeting are presented at an additional meeting ("Discharge Meeting") to discuss their extended prognosis.

126.    At the Discharge Meeting, the Team Manager presents patient(s) to the panel, usually the program Medical Director, Patient Care Administrator and Director of Admissions or General Manager, and the group decides whether the patient should remain in hospice or be discharged as recommended by the team.

127.    At these discharge meetings, there was concern by participants that if they discharged too many patients, it would be frowned upon by the VITAS hierarchy. The instruction from management was to reduce the number of discharges even if the patients were eligible for discharge.

128.    A discharge for "extended prognosis" means a discharge where the patient's individual prognosis extends beyond six months, rendering the patient ineligible for the MHB.

129.    Re-certification was generally suggested by the nurses and simply confirmed by the physicians. There was pressure on the physicians at VITAS that if they were the one who initially re-certified a patient, than he or she should continue to re-certify that patient and keep the patient in the system. There was pressure on the physicians at VITAS to increase the census.

130.    VITAS physicians expressed concern about patients that were being recertified, when the physician thought that the patient was inappropriate for hospice care. They would take up the issue with the team director, usually a nurse, and then the team manager who would be responsible to take the discharge issue up with the medical director. Generally the medical director would instruct that the patients not be discharged. Other physicians continued to re certify or avoid suggestion of patients for discharge for extended prognosis in order to avoid the confrontation with management surrounding discharging patients from Vitas Hospice care.

131.    Under VITAS policies and procedures, if a Discharge Meeting does not take place, then there is no opportunity for patients to be discharged for extended prognosis.

132.     Team Managers were pressured not to recommend patients for Discharge Meetings.

133.     The VITAS program in Miami-Dade County, Florida stopped holding Discharge Meetings.

134.     Patient revocations and discharges for extended prognosis were tracked by the VITAS computer system to be sure that patients were not coming off of the hospice program to early.

135.     The process flowchart creates levels of hurdles to prevent patients with a prognosis of more than 6 months from being discharged.

136.     If the team's input and documentation does not justify re-certification, the physician must visit the patient, document the visit, discuss the patient with the attending physician, and order any laboratory or radiological studies that would be helpful in confirming the prognosis.

137.     If the physician still cannot confirm the prognosis to re-certify, rather than order discharge, he must submit in written form, to his superior, the medical director and other members of the senior management team, all of his notes and pertinent information that have been obtained that could be useful in helping to determine the patient's prognosis.

138.     If the medical director and/or the members of the senior management team cannot confirm the diagnosis to re-certify, rather than ordering discharge, they must refer the patient discharge issue to Dr. J.R. Williams or Dr. B. Kinzbrunner, the senior medical personnel at VITAS. Only if these two senior medical persons at VITAS clear the patient for discharge may the patient be discharged for extended prognosis.

139.     At all times relevant hereto and with regard to all claims referenced herein, the system was designed to prevent the discharge of patients for extended prognosis.

**I.   VITAS CREATED ECONOMIC INCENTIVES AND THE "STRETCH GOAL," TO PROMOTE THE FALSE RE-CERTIFICATION OF PATIENTS AS ELIGIBLE FOR THE MHB**

140.     In an effort to increase its  Medicare and Medicaid revenue, VITAS implemented an incentive program and the "Stretch Goal," to increase its average daily census (ADC) from existing patients and further promote a pattern by the teams responsible for consideration of discharges for extended prognosis and their superiors of willful blindness to clinical information that would be required to properly certify whether MHB beneficiaries under VITAS' care remained eligible for the MHB at the beginning of each benefit period. This policy resulted in the false claims and unjustified and excessive lengths of stays for existing patients as reflected on Redacted Exhibit "A" and Exhibit "A," under seal.

141.     VITAS received Medicare and Medicaid revenue from the excessive lengths of stay for which VITAS employees were benefiting under the Stretch Goals and other bonus programs at VITAS.  There was no incentive to release unqualified patients from hospice care and into curative care because VITAS established a bonus structure that made it extremely profitable for the VITAS employees, including the medical director, to keep unqualified patients in the system and increase the ADC.

142.     VITAS also profited from discouraging diagnostic testing for re-certification in that it is did not incur the expenses for the diagnostic testing necessary for a physician's exercise of clinical judgment in re-certifying patients for the MHB. VITAS was not able to bill separately for this testing.

143.     The ADC represents the average number of eligible patients admitted to a program.  The ADC is calculated by dividing the total number of days patients stayed in the program during a certain period by the total number of calendar days in that period.

144.     VITAS' Stretch Goal promotion offered employees bonuses ranging from $5,000 to $10,000 conditioned upon each program reaching its Stretch Goal Number, a program-specific ADC figure over and above normal growth expectations.

145.     Upon reaching the Stretch Goal number for each program, the General Manager was rewarded with a bonus of $10,000, and the Director of Admissions, Patient Care Administrator and Medical Director would each receive $5,000. The Medical Director and General Manager were directly responsible for the team physicians recertifying the patients for the MHB.

146.     Once these programs reached the initial Stretch Goal, VITAS modified the promotion.  Under the modified Stretch Goal, General Managers would then receive a $5,000 bonus each time the ADC grew by 25, and Directors of Admission, Patient Care Administrators and Medical Directors would receive $2,500 each time the ADC grew by 15.

147.      VITAS continued its Stretch Goal promotion and bonus structures in order to promote longer patient lengths of stay ("LOS") regardless of whether the patients continue to be eligible for the MHB.

148.     This census growth was due to keeping inappropriate patients through a flawed administrative process designed to keep patients in the system and the willful blindness to necessary diagnostic criteria that may render its patients ineligible for the MHB.

149.     Only two ways existed to produce more revenue at VITAS: produce new patients or keep those in the system for longer lengths of stay increasing the ADC.

**J.  THE CENSUS EXPERIENCE**

150.     During the months of March, June and October of 2003, VITAS' Dade program did not discharge any patients for extended prognosis.

151.    As of March 2004, over 300 of the patients at the VITAS Dade program had lengths of stay that were over 1 ½ years, or approximately seven re-certifications.

152.    In 2001, VITAS' Dade program discharged 1.7% of its patients for extended prognosis.  This number remained steady in 2002.  In 2003, this number fell to .5%.

153.    During the same period, the ADC for VITAS' Dade program grew from approximately 700 in 2001, to approximately 800 in 2002, and approximately 900 in 2003.

154.    During this period of ADC growth, the number of patients that VITAS admitted grew marginally, while those patients discharged for extended prognosis dropped dramatically.

155.    On a company-wide basis, 946, 794 and 780 patients were discharged for extended prognosis in 2001, 2002 and 2003, respectively.

156.    During the same period, VITAS' Dade program discharged 84, 75, and 25 patients for extended prognosis in 2001, 2002 and 2003, respectively.

157.    Between January 1, 2004 and April 8, 2004, VITAS' Dade program discharged only 5 patients for extended prognosis.

158.    On March 24, 2004, 2,152 of the 8074 patients admitted to VITAS' programs had LOS that equaled or exceeded 240 days.

159.    On or about January 7, 2004, JoAnn Mack, Vice President of Hospice Operations, sent an e-mail message to VITAS executives where she expressed concern about the census and LOS.

160.    Relator, Ostrom, specifically addressed his concerns about excessive LOS with VP, National Medical Director, Barry Kinzbrunner and VP, Hospice Resources, Patty Husted.

161.    Relator, Ostrom, asked an internal VITAS auditor whether VITAS examined long LOS and was told that it does not.

162.      Relator, Barys, specifically addressed her concerns about excessive LOS with General Manager, Dian Backoff and Vice President, Hospice Operations, Ian Viente.  Barys was told by Backoff to "worry about your own business because VITAS doesn't want Medicare coming into the program again like they did in 1997 when they discharged 100 patients."

163.      Barys was terminated in March 2004, shortly after reporting her concerns about excessive LOS.

164.      Based on Barys' concerns regarding excessive LOS, Barys ran a VITAS report concerning LOS from the VX system.  This report was in a folder on her desk on the day she was fired by VITAS.

165.      Relators have retained The Fischman Law Firm, P.A.. to represent them in this matter and are obligated to pay a reasonable fee for the attorneys' services.

### K.   VITAS' FAILURE TO OBTAIN THE NECESSARY CLINICAL INFORMATION TO RE-CERTIFY PATIENTS FOR THE MHB MAY DEPRIVE PATIENTS OF IMPORTANT INFORMATION RELEVANT TO THEIR HEALTH CARE DECISIONS

166.      VITAS' failure to obtain new data when re-certifying prognosis deprived patients of vital information that they needed to make an informed decision concerning their health care needs and the opportunity to know whether there has been an improvement in their prognosis.

167.      By failing to conduct proper medical tests, VITAS kept patients in its program whose prognosis may have improved and whose lives may have been prolonged if they received curative medical treatment.

### COUNT I
### FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)

168.      Relators re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 167 of the Amended Complaint.

169.     This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended.

170.     By means of the acts described above, VITAS knowingly presented or caused to be presented false or fraudulent claims for payment of hospice services to the United States Government.

171.     The United States, unaware of the falsity of the claims made by VITAS, and in reliance on the accuracy thereof, paid VITAS for claims that would otherwise not have been allowed.

172.     By reason of these payments, the United States has been damaged, and continues to be damaged, in the amounts set forth on Exhibit "A."

WHEREFORE, Relators pray for a judgment against VITAS for the following relief:

a.     Civil penalties for each false claim pursuant to 31 U.S.C. § 3729(a);

b.     Three times the amount of damages proved pursuant to 31 U.S.C. § 3729(a);

c.     Reasonable attorneys' fees, expenses and court costs;

d.     Pre-judgment and post-judgment interest at the maximum rates permitted by law;

e.     An award to the Relators pursuant to 31 U.S.C. § 3730(d) of the appropriate percentage of the amount recovered by the United States as a result of this action; and

f.     Such other and further relief as the Court deems just and proper.

## COUNT II
## FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(2)

173.     Relators re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 167 of the Amended Complaint.

174.     This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended.

175.     By means of the acts described above, VITAS knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims for hospice services paid by the United States Government.

176.     The United States, unaware of the falsity of the records or statements made by VITAS, and in reliance on the accuracy thereof, paid and continues to pay VITAS for claims that would otherwise not have been allowed.

177.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

WHEREFORE, Relators pray for a judgment against VITAS for the following relief:

a.     Civil penalties for each false claim pursuant to 31 U.S.C. § 3729(a);

b.     Three times the amount of damages proved pursuant to 31 U.S.C. § 3729(a);

c.     Reasonable attorneys' fees, expenses and court costs;

d.     Pre-judgment and post-judgment interest at the maximum rates permitted by law;

e.     An award to the Relators pursuant to 31 U.S.C. § 3730(d) of the appropriate percentage of the amount recovered by the United States as a result of this action; and

f.     Such other and further relief as the Court deems just and proper.

## COUNT III
## FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(3)

178.     Relators re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 167 of the Amended Complaint.

179. This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended.

180. By means of the acts described above, VITAS, its subsidiaries and affiliates conspired to defraud the United States Government by getting false or fraudulent claims allowed or paid.

181. The United States, unaware of the falsity of the records, statements or claims made by VITAS, and in reliance on the accuracy thereof, paid and continues to pay VITAS for claims that would otherwise not have been allowed.

182. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

WHEREFORE, Relators pray for a judgment against VITAS for the following relief:

a. Civil penalties for each false claim pursuant to 31 U.S.C. § 3729(a);

b. Three times the amount of damages proved pursuant to 31 U.S.C. § 3729(a);

c. Reasonable attorneys' fees, expenses and court costs;

d. Pre-judgment and post-judgment interest at the maximum rates permitted by law;

e. An award to the Relators pursuant to 31 U.S.C. § 3730(d) of the appropriate percentage of the amount recovered by the United States as a result of this action; and

f. Such other and further relief as the Court deems just and proper.

### COUNT IV
### RETALIATORY DISCHARGE CLAIM OF RELATOR, BARYS, PURSUANT TO 31 U.S.C. § 3730(h)

183. Relator, Barys, re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 167 of the Amended Complaint.

184.        This is an action pursuant to 31 U.S.C. § 3730(h).

185.        By virtue of the activities described in paragraphs 1-167, Barys has engaged in conduct protected under the False Claims Act.

186.        VITAS was aware of Barys' actions.

187.        VITAS terminated Barys in retaliation for her conduct protected under the False Claims Act.

188.        By virtue of her retaliatory discharge by VITAS, Barys has suffered damages.

WHEREFORE, Relator, Barys, prays for a judgment against VITAS for the following relief:

a.        Lost compensation based on the same seniority status as she would have had but for the discrimination;

b.        Two times the amount of back pay;

c.        Interest on the back pay;

d.        Compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and

e.        Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators demand trial by jury on all issues so triable by right.

Dated this 11th day of January, 2007.

Respectfully submitted,


s/Bruce D. Fischman
BRUCE D. FISCHMAN, ESQ.
Fla. Bar No.: 218472
E-mail: bruce@fhdlaw.com
THE FISCHMAN LAW FIRM, P.A.
3050 Biscayne Boulevard, Suite 600
Miami, Florida 33137
Telephone:  (305) 576-5522
Facsimile:  (305) 576-7079


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 11, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By:   s/Bruce D. Fischman
        BRUCE D. FISCHMAN

**SERVICE LIST**
***BARYS, et al. versus VITAS HEALTHCARE COPRORATION, et al.***
**Case No. 04-21431-CIV-Jordan/Torres**
**United States District Court, Southern District of Florida**


Bruce D. Fischman, Esq.                                      Via electronic filing
bruce@fhdlaw.com
Adam Feldman, Esq.
adam@fhdlaw.com
The Fischman Law Firm, P.A.
3050 Biscayne Boulevard, Suite 600
Miami, Florida 33137
Telephone:  (305) 576-5522
Facsimile:  (305) 576-7079
*Attorneys for Relators Barys and Ostrom*


Peter S. Spivack, Esq.                                      Via facsimile and U.S. Mail
psspivack@hhlaw.com
HOGAN & HARTSON, L.L.P.
555 13th Street, N.W.
Washington, D.C. 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
*Attorneys for Defendants Vitas Healthcare Corporation, Vitas Hospice Services, LLC and Vitas Healthcare Corporation of Florida*


Carol A. Licko, Esq.                                      Via electronic filing
calicko@hhlaw.com
Stephanie L. Carman, Esq.
slcarman@hhlaw.com
HOGAN & HARTSON, L.L.P.
Mellon Financial Center, 19th Floor
1111 Brickell Avenue
Miami, Florida 33131
Telephone:  (305) 459-6500
Facsimile:  (305) 459-6550
*Attorneys for Defendants Vitas Healthcare Corporation, Vitas Hospice Services, LLC and Vitas Healthcare Corporation of Florida*

Jullia Callahan, Esq.                                    Via facsimile and U.S. Mail
Jullia.Callahan@usdoj.gov
United States Department of Justice
Patrick Henry Building, Room 9537
601 D Street
Washington, D.C. 20004
Telephone:  (202) 616-0291
Facsimile:  (202) 514-0280
*Attorneys for the United States*

Mark Bodner, Esq.                                        Via facsimile and U.S. Mail
Mark.Bodner@usdoj.gov
Assistant Attorney General, State of Florida
Office of the Attorney General
Medicaid Fraud Control Unit
Rivergate Plaza, Suite 650
444 Brickell Avenue
Miami, Florida 33133
Telephone:  (305) 377-5441
Facsimile:  (305) 377-5925
*Attorneys for the State of Florida*