UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-21431-CIV-JORDAN/TORRES

EVE BARYS and DWAYNE OSTROM            )
ex rel. UNITED STATES and the          )
STATE OF FLORIDA,                      )
                                       )
            Plaintiffs                 )
                                       )
v.                                     )
                                       )
VITAS HEALTHCARE CORPORATION,          )
VITAS HOSPICE SERVICES, LLC,           )
VITAS HEALTHCARE CORPORATION OF        )
FLORIDA, ET AL.,                       )
                                       )
            Defendants                 )
                                       )
_____)

**ORDER GRANTING MOTION TO AMEND,
DISMISSING AMENDED COMPLAINT, AND CLOSING CASE**

   This order considers the appropriateness of the plaintiffs' motion to amend, as well as the sufficiency of the amended complaint. Although filed in an untimely fashion, the plaintiffs have presented "good cause" for their failure to adhere to a pretrial scheduling order. Moreover, at this stage in the litigation, the plaintiffs remain entitled to amend once as a matter of course. Therefore, the plaintiffs' motion to amend [D.E. 62] is GRANTED. An examination of the amended complaint, however, reveals that the plaintiffs remain unable to state a claim upon which relief may be granted. Therefore, the plaintiffs' amended complaint [D.E. 63] is DISMISSED.

**I. INTRODUCTION**

   On June 15, 2004, the plaintiffs filed a *qui tam* action against the defendants, seeking treble

damages and civil penalties arising from alleged violations of the Federal False Claims Act, 31 U.S.C. §3729, et seq., and the Florida False Claims Act, Fla. Stat. §§68.081–68.092. On September 25, 2006, the defendants filed a motion to dismiss under Rule 12(b)(6), arguing that the plaintiffs' complaint failed to state its allegations of fraud with the "particularity" required by Rule 9(b). On October 23, 2006, I entered a scheduling order pursuant to Rule 16. The order required that all motions and proposed amendments to the pleadings be filed by December 16, 2006. Despite the passage of this deadline, the plaintiffs now request leave to modify the scheduling order and amend their complaint.

## II. LEGAL STANDARDS

"Rules 15 and 16 of the Federal Rules of Civil Procedure ... guide [a] court's decision whether to allow an untimely amendment to [a] complaint." *Nobles v. Rural Cmty. Ins. Serv.*, 303 F. Supp. 2d 1279, 1283 (M.D. Ala. Feb. 23, 2004) (emphasis omitted). Rule 15 provides that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ...." FED. R. CIV. P. 15(a). However, "[w]hen a motion to amend is filed after a scheduling order deadline, Rule 16 is the proper guide for determining whether a party's delay may be excused." *Sosa v. Airprint Sys.*, 133 F.3d 1417, 1418 n.2 (11th Cir. 1998). "It is only after [a] court addresses whether the proposed amendment may be granted under Rule 16 that the court is to determine whether it is proper under Rule 15." *Nobles*, F. Supp. 2d. at 1283 (citing *Sosa*, 133 F.3d at 1419). In order to satisfy Rule 16, a plaintiff must establish "good cause" for the request by demonstrating that the pretrial schedule could not have been reasonably met despite her diligence. *See Sosa*, 133 F.3d at 1418.

Under Rule 12(b)(6), a complaint should be dismissed if the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). In determining whether to dismiss a complaint, I must accept all well-pleaded factual allegations in the complaint as true and evaluate all inferences derived from those facts in the light most favorable to the plaintiffs. *See Hoffend v. Villa*, 261 F.3d 1148, 1150 (11th Cir. 2001). Although this imposes a low threshold, the plaintiffs are "still 'required to allege some specific factual bases for th[eir] conclusions or face dismissal.'" *County of Santa Clara v. Astra USA, Inc.*, 2006 U.S. District. LEXIS 57176, at *6 (N.D. Cal. July 28, 2006) (quoting *Jackson v. Bellsouth*

*Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004)).  As explained below, claims alleging fraud under the False Claims Act[1] must be pled with particularity.  *See, e.g., United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006).

"To state a claim under the FCA, the relator must demonstrate that (1) the defendant presented to the government a claim for payment, (2) the claim was false or fraudulent, (3) the defendant knew that the claim was false, and (4) the government suffered damages as a result of the false or fraudulent claim." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 20 F. Supp. 2d 1017, 1019 (S.D. Tex. 1998) (citing *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed. Cir. 1994)).  Pursuant to Rule 8(a), the assertion of a valid claim requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Moreover, the statement can "be simple, concise and direct," and need not conform to any "technical forms of pleading." FED. R. CIV. P. 8(e).  However, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b).

A complaint merely incorporating "general conclusory allegations of fraud" will not satisfy this requirement. *United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562, 568-69 (11th Cir. 1994) (per curiam).  Instead, the plaintiffs' complaint "must include facts as to the time, place, and substance of the defendant[s'] alleged fraud" including "the details of the defendant[s'] allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex rel. Clausen v. Lab. Corp. Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (citing *Cooper*, 19 F.3d at 568)). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. Clausen v. Lab. Corp. Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202

---

[1] The False Claims Act ("FCA") permits private persons to file a *qui tam* claim against "[a]ny person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government    a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;    ." 31 U.S.C. §3729(a)(1)-(2).  The Florida False Claims Act need not be considered separately, as it mirrors the federal statute nearly verbatim.  This statute extends liability to "any person who: (a) Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval; (b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim allowed or paid    ." §68.081(2)(a)-(b).

(11th Cir. 1994)).

### III. DISCUSSION

#### A. LEAVE TO AMEND

Since the defendants have yet to file a responsive pleading in this case, Rule 15, in itself, is not an obstacle to the plaintiffs' motion to amend. In fact, absent the scheduling order and its Rule 16 implications, the plaintiffs would be free to amend once as a matter of course. Thus, in order to rule on this motion, I need only determine whether the plaintiffs satisfy Rule 16 by presenting "good cause" for their noncompliance with the scheduling order.

Less than a week before the scheduling deadline, the defendants filed a notice of supplemental authority [D.E. 60], supporting their pending motion to dismiss. With the filing, the defendants attached a copy of the recently decided case of *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006). In response, the plaintiffs moved to amend, claiming that *Atkins* placed them at increased risk of having their complaint dismissed with prejudice. In *Atkins*, like here, a plaintiff submitted a memorandum opposing a defendant's pending motion to dismiss. As part of his memorandum, the plaintiff requested leave to amend, but failed to attach a copy of the proposed amended complaint. "Assuming that [his] request was the functional equivalent of a motion, [the court] affirm[ed] the district court's rejection [of the request, finding that] it failed to include the proposed amendment or the substance thereof as required by *Long* [*v. Satz*, 181 F.3d 1275 (11th Cir. 1999)]." *Atkins*, 470 F.3d at 1362.

Although I agree that *Atkins* establishes good cause for the plaintiffs' noncompliance in this case, I disagree with the argument put forth by the plaintiffs in arriving at this conclusion. The plaintiffs contend that *Atkins* "created a conundrum," which forced them to either file a motion to amend or face dismissal with prejudice. In other words, the plaintiffs make the argument that *Atkins* requires the filing of a preemptory motion whenever a complaint faces possible dismissal. I disagree. *Atkins* merely reiterated the long-standing rule that *when a plaintiff seeks leave to amend*, he must "attach a copy of the proposed amendment … or set forth the substance thereof." *Atkins*, 470 F.3d at 1362. The decision did not call for a plaintiff to file a motion where they would not have otherwise. Unlike *Atkins*, the plaintiffs did not make an unsupported request as part of their memorandum. In fact, prior to filing their motion, the plaintiffs made no mention of a desire to amend. Thus, the present case is distinguishable from *Atkins*, and the plaintiffs fail to establish good cause based on this particular argument.

Nonetheless, *Atkins* did clarify the law on another important issue.  In their memorandum opposing the defendant's motion to dismiss [D.E. 43], the plaintiffs relied overwhelmingly on the Eleventh Circuit's prior ruling in *Hill v. Morehouse Med. Assoc. Inc.*, 82 Fed. Appx. 213, 2003 WL 22019936 (11th Cir. Aug. 15, 2003) (unpublished).  They argued that *Hill* held that "when specific factual information, …, [is] in the exclusive control of the [d]efenants, [Rule 9(b)'s] heightened pleading standard should be applied less stringently."  Specifically, the plaintiffs' relied on *Hill* as justification for their failure to "attach patient files and actual billings … [that were] in the exclusive possession of VITAS," stating that such materials "should be obtained through discovery."  However, in *Atkins*, the Eleventh Circuit distinguished *Hill* and refused to follow the decision to the extent it was inconsistent with prior precedent.  *See Atkins*, 470 F.3d at 1358 n.15.  Instead, the Eleventh Circuit reaffirmed that a plaintiff must be precluded from discovery where he has failed to identify a single claim with particularity.  *See id.* at 1359.  Decided only two weeks before the scheduling deadline, *Atkins* likely left the plaintiffs scrambling to secure the documentation they had failed to gather.  Ultimately, they were able to compile some documentation and draft a proposed amended complaint in a little over a month.

Although a close call, I conclude that the plaintiffs exercised due diligence upon learning of the *Atkins* decision, and could not have reasonably gathered the necessary documentation prior to the scheduling deadline.  I recognize that the plaintiffs were imprudent in placing great stock in an unpublished decision.  However, this mistake is not significant enough to justify denial of the plaintiffs' motion, especially in light of the fact that such a ruling would essentially decide this case by limiting the plaintiffs to an original complaint that is now clearly deficient to all concerned.  One of the central purposes of the Federal Rules of Civil Procedure "is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." 5 Charles A. Wright, Arthur R. Miller & Mary K. Kane, FEDERAL PRACTICE AND PROCEDURE §1471 (2d ed. 1990).  With this in mind, I extend the plaintiffs the benefit of the doubt and assume that they believed in good faith that *Hill*, although unpublished, represented a future trend in the law regarding FCA claims.  That being said, I conclude that Rule 16 is satisfied.

### B. THE SUFFICIENCY OF THE AMENDED COMPLAINT

In their amended complaint, the plaintiffs allege that the defendants violated the FCA by submitting payment requests to "Medicare, Medicaid, and other government agencies and programs

5

based on false records and statements." Specifically, the plaintiffs contend that the defendants engaged in improper re-certification procedures and "knowingly, deliberately, and systematically overcharged federal health care programs for hospice services rendered to patients who were ineligible for the hospice benefits provided by those programs." As former employees, the plaintiffs claim to have personal knowledge that the defendants submitted such claims to the government. They assert that the defendants "automatically billed Medicare and Medicaid for each per diem unit of service electronically through [a] patient electronic information system" called VX. The plaintiffs specify that the VX system submitted these claims "between the first and the fourth of each and every month     covering all billing days ('billed units') for the prior month." The plaintiffs also maintain that Exhibits "A" through "C" reflect a detailed listing of ineligible patients and fraudulent billing records gathered from the VX system.

By providing this information, the plaintiffs have set forth sufficient facts to establish the first element of their FCA claim. Indeed, the provision of detailed patient lists and VX-generated billing records provides tangible evidence that the defendants submitted claims to the government for payment.

Nevertheless, the plaintiffs fail to establish the second element of their cause of action because they present nothing to support the contention that the claims submitted were actually fraudulent. Instead, the plaintiffs simply set forth bald allegations that the defendants "submitted claims     based on false re-certification of patients" and implemented procedures "designed to prevent the discharge of patients" from the hospice program. The Eleventh Circuit has made it clear that such "conclusory allegations, [and] unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" of an FCA claim. *United States ex rel. Feingold v. Palmetto Government Benefits Administrators*, 477 F. Supp. 2d 1187, 1193 (S.D. Fla. 2007) (quoting *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)). Moreover, the plaintiffs are not excused from asserting specific allegations of fraud simply because they have provided detailed facts regarding the submission element. *See County of Santa Clara v. Astra USA, Inc.*, 2006 U.S. District. LEXIS 57176, at *6 (N.D. Cal. July 28, 2006) ("The purchasing records referenced in the complaint do not help plaintiff. These mere records of purchases, although detailed, in no way suggest that the amounts charged were improper."). Since the amended complaint here clearly lacks the "indicia of

6

reliability" necessary to plead a fraud claim under Rule 9(b),[2] I need not address the sufficiency of the remaining elements of the plaintiffs' FCA claim.

The plaintiffs' allegations hinge on the misconception that evidence of lengthy patient participation in the hospice program is sufficient to raise an inference of fraud.[3] However, simply highlighting patients with lengthy participation periods does not support the inference that the claims associated with these patients were fraudulent. Under the Medicare and Medicaid programs, a physician must certify that a patient is "terminally ill" before the patient is eligible for hospice benefits. *See* 42 U.S.C. §1395f(a)(7). Terminal illness is established when "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 C.F.R. §418.3. In their motion to dismiss, the defendants correctly explain that this standard, as an objective measure, imposes no limit on the actual duration that a given patient may receive hospice benefits. Instead, the program divides hospice benefits into an initial 90-day period, a subsequent 90-day period, and an unlimited number of 60-day benefit periods thereafter. *See* 42 U.S.C. §1395d(a)(4). At the beginning of each period, a physician must re-certify that the patient remains terminally ill for the benefits to continue. *See* 42 U.S.C. §1395f(a)(7). Although the plaintiffs assert that their exhibits identify claims resulting from "false re-certifications," the amended complaint fails to provide a factual basis for doubting the terminal prognosis of even a single patient listed.

I recognize that "a plaintiff is not expected to actually prove his allegations" to comply with the rules of pleading, but I "cannot be left wondering whether a plaintiff has offered mere conjecture or a specifically pleaded allegation on an essential element of the lawsuit." *Clausen*, 290 F.3d at 1313. In other words, a plaintiff must demonstrate exactly why she believes the claims submitted were fraudulent.

For example, in *United States ex rel. McNutt v. Haleyville Medical Suppiles, Inc.*, 423 F.3d 1256, 1258 (11th Cir. 2005), the government alleged that the defendants violated the FCA by engaging in an illegal kickback scheme. In particular, it alleged that the defendants issued monthly payments to pharmacists in exchange for patient referrals generating Medicare claims. Although the defendants admitted to submitting patient claims to Medicare, they challenged the government's

---

[2] *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013-14 (11th Cir. 2005).

[3] In particular, an examination of Exhibit "A" reveals that Plaintiffs have simply targeted all patients whose participation has extended beyond 360 days.

assertion that such submissions were fraudulent and argued that each claim stemmed from the provision of legitimate medical services. In its complaint, the government explained that all Medicare providers were required to certify their ongoing compliance with Medicare laws. It further alleged that the defendants' activities constituted a violation of the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), which automatically disqualified the defendants from participation in the Medicare program, and made all subsequent submissions fraudulent. *Id.* at 1257-58. The government supported its allegations by detailing numerous instances where such kickbacks occurred. For each instance, the government identified the patient referred, the date the defendants submitted the claim, and the individual receiving a commission for the referral. These allegations, the Eleventh Circuit concluded, were sufficient to state a claim under the FCA

Unlike the government in *McNutt*, the plaintiffs here have failed to make specific allegations that support the inference that the defendants' re-certification procedures resulted in the submission of fraudulent claims. Although the plaintiffs characterize the defendants' procedures as improper, none of the procedures highlighted in the amended complaint appear contrary to applicable Medicare regulations. For example, the plaintiffs contend that the defendants "re-certified patients for [benefits] absent current lab work, diagnostic techniques or physician contact in order to save costs." They further contend, without citing authority, that a "physician cannot accurately re-certify a patient concerning a patient's prognosis where the necessary clinical data is not currently available." However, the plaintiffs are incorrect in implying that the law requires testing, lab work, or physician visits for all re-certifications.[4]

Moreover, the plaintiffs acknowledge that the defendants conduct physician visits and diagnostic testing when "the team does not recommend re-certification" based on nurse recommendations and progress notes. The plaintiffs' concern that such steps are initiated "only if the patient's prognosis is questioned by a team member which may be an employee with no clinical training such as a home health aide, social worker or chaplain," is curious considering current

---

[4] *See* 42 C.F.R. §418.22 ("Certification will be based on the physician's or medical director's clinical *judgment* regarding the normal course of the individual's illness.") (emphasis added). *See also* 42 C.F.R. §418.74 ("[T]he hospice must establish and maintain a clinical record for every individual receiving care . Each individual's record contains – (1) The initial and subsequent assessments; (2) The plan of care; (3) Identification number; (4) Consent and authorization and election forms; (5) Pertinent medical history; and (6) Complete documentation of all services and events (including evaluations, treatments, progress notes, etc.)."). Neither of these regulations state that testing and lab work are required for all re-certifications.

8

Medicare regulations. These regulations specifically require that interdisciplinary teams, comprised of both medical and non-medical personnel, evaluate patient files during the re-certification process.[5] Additionally, the fact that the defendants' policies require unanimous approval, on all re-certifications, prevents non-medical members from making a decision contrary to the clinical judgment of the team physician.

The plaintiffs make the generalization that the defendants' procedures improperly instruct employees regarding the re-certification process. For example, the plaintiffs point to Exhibit "E" as support for the following statements:

> "[I]f a patient is determined to be *inappropriate* for continued hospice care [defendants]' policy is to initiate another layer of administration." (emphasis added).

> "The process flowchart creates levels of hurdles to prevent patients with a prognosis of *more than* 6 months from being discharged." (emphasis added).

However, the plaintiffs fundamentally misrepresent this document by inserting the terms "inappropriate" and "more than." Notwithstanding the plaintiffs' interpretation, Exhibit "E" merely shows that additional layers of review are triggered when a prognosis of *less than* 6 months cannot be confirmed based on the information initially available to the interdisciplinary team or subsequently compiled by the team physician through a mandatory patient visit. Thus, only a patient with an *uncertain* prognosis will reach such layers of review. Absent facts pointing to specific instances of fraud, nothing appears wrong with the defendants' decision to reserve costly diagnostic testing for patients with uncertain prognoses.

Finally, the plaintiffs cannot cure the deficiencies of their complaint simply by declaring that they have "personal knowledge" of the defendants' fraudulent re-certification and submission practices. Without factual support, such a general and conclusory statement does not provide the plaintiffs with an automatic ticket to discovery. The "clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed." *United States ex rel. Butler v. Magellan Health Services, Inc.*, 74 F. Supp. 2d 1201, 1215 (M.D. Fla. 1999)

---

[5] 42 C.F.R. §418.68(a) ("Medicare regulations require that a hospice must designate an interdisciplinary group ("ID Group") or groups comprised of hospice employees that include at least the following: 1) a doctor of medicine or osteopathy; 2) a registered nurse; 3) a social worker; and 4) a pastoral or other counselor.").

(quoting *United States ex rel. Stinson v. Blue Cross Blue Shield*, 755 F. Supp. 1040, 1050 (S.D. Ga. 1990)). The weight of a plaintiffs' "firsthand knowledge" must be determined in light of the facts provided elsewhere in the complaint.

For example, in *United States ex rel. Walker v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1353 (11th Cir. 2005), Ms. Walker alleged that her employer knowingly overcharged for nursing services and submitted fraudulent claims for Medicare reimbursement. However, she did not rest these allegations on a conclusory statement that she had "firsthand knowledge" of such practices. In her complaint, Ms. Walker alleged that the defendant acted contrary to Medicare laws by "bill[ing] all nurse practitioner and physician assistant services as 'incident to the services of a physician,' even though the [staff] often treated patients when no physician was physically present at the clinic."[6] *Id.* at 1353-54. To support her allegations of fraud, Walker specified that she (1) billed under a physician's number throughout her employment as a nurse, (2) received instructions from supervisors to follow this practice, and (3) often performed her work without a physician. The defendant readily admitted that it submitted all nursing-service claims to Medicare, but challenged the assertion that these claims were fraudulent.

When the defendant in *Walker* moved to dismiss on Rule 9(b) grounds, the district court denied the motion, ruling that the "allegations [were] sufficient to explain why Walker believed [the defendant] submitted false or fraudulent claims for services rendered by nurse practitioners ." *Id.* at 1360. Walker's complaint had an "indicia of reliability" because her firsthand experience explained her belief that defendant's nurses had been billing improperly. Moreover, the defendant's admissions confirmed that if Walker's allegations of improper billing were correct, the defendant had also submitted fraudulent claims to the government.

Here, the plaintiffs' factual allegations do not rise to the level of the complaint in *Walker*. Instead, the amended complaint includes merely vague and conclusory statements such as:

> "At discharge meetings, there was concern by participants that if they discharged too many patients it would be frowned upon by the [defendants'] hierarchy. The

---

[6] Medicare providers bill for services "in one of two ways; [with] the amount of reimbursement dependent on the billing method." If a nurse worked in conjunction with a physician, they were required to bill their time "incident to the services of a physician" under the physician's identification number. Alternatively, if a nurse worked largely unsupervised, Medicare required billing under the nurse's own identification number. *Walker*, 433 F.3d at 1352-53.

10

instruction from management was to reduce the number of discharges even if the patients were ineligible."

"[W]hen the physician thought that the patient was inappropriate for hospice care, they would take up the issue with the team director, usually a nurse, and then the team manager who would be responsible to take the discharge issue up with the medical director. Generally [sic] the medical director would instruct that the patients not be discharged."

The plaintiffs' exhibits do little to improve upon these allegations. For example, the plaintiffs present Exhibit "D" to highlight the irrelevant fact that there has been official concern regarding "certain questionable practices" within the hospice industry. However, the bulletin included within the exhibit is more illustrative of the types of substantive allegations the plaintiffs fail to make in their amended complaint. Unlike the examples in the bulletin, the plaintiffs have not alleged specific instances where "nurse employees [were asked] to alter notes in patients' records or to otherwise misrepresent patients' medical conditions, in order to falsify the existence of a terminal condition." In fact, the plaintiffs do not allege a single fact that would support their alleged knowledge of fraudulent re-certifications. As a result, the plaintiffs fail to state a claim upon which relief may be granted.

### IV. CONCLUSION

The plaintiffs' motion to amend [D.E. 62] is GRANTED. The plaintiffs' amended complaint [D.E. 63], however, is DISMISSED WITH PREJUDICE.

This case is CLOSED and all pending motions are DENIED AS MOOT.

DONE AND ORDERED in chambers in Miami, Florida, this 24th day of June, 2007.

_____
Adalberto Jordan
United States District Judge

Copy to:    All counsel of record